**NOS. 10-55658, 10-55660, 10-55662,
10-55663, 10-55664, 10-55665, 10-55667, 10-55668**

# United States Court of Appeals for the Ninth Circuit

SYLVESTER MAYA; OFER MASACHI, as Individuals and on
behalf of all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

CENTEX CORPORATION; CENTEX HOMES, a Nevada General Partnership;
CTX MORTGAGE COMPANY,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

## BRIEF FOR PLAINTIFFS-APPELLANTS

Derek Brandt
SIMMONS BROWDER GIANARIS
  ANGELIS & BARNERD LLC
707 Berkshire Boulevard
East Alton, Illinois 62024
(618) 259-6357

Andrea Bierstein
HANLY CONROY BIERSTEIN SHERIDAN
  FISHER & HAYES LLP
112 Madison Avenue
New York, New York 10016
(212) 784-6400

Richard D. McCune
Jae Eddie K. Kim
David Wright
MCCUNEWRIGHT, LLP
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
(909) 557-1250

*Attorneys for Plaintiffs-Appellants*

October 5, 2010

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants state as follows:

Each of the named Plaintiffs in these eight actions is a natural person; none is a corporate party.

# TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ................................................................. 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................... 3

STATEMENT OF THE CASE ................................................................... 4

    Nature of the Case ...................................................................... 4

    Course of Proceedings and Disposition Below ..................................... 9

STATEMENT OF FACTS ....................................................................... 11

    Structure of Defendants' Business .................................................. 11

    Use of the Business Structure to Implement a Scheme to Increase
    Profits and Executive Compensation ............................................... 13

    Plaintiffs' Injuries .................................................................... 17

SUMMARY OF THE ARGUMENT ............................................................. 19

ARGUMENT .................................................................................... 24

    I.    PLAINTIFFS HAVE STANDING TO SEEK DAMAGES ......................... 24

        A.    Plaintiffs Have Standing Because They Have a
            Concrete Stake in this Litigation ...................................... 25

        B.    The Complaints Allege Sufficient "Injury in Fact" to
            Meet the Requirements for Standing ................................. 29

            1.    *Plaintiffs' Allegations that They Were
                Defrauded into Overpaying for Their Homes
                Plead an "Injury in Fact"* ........................................ 30

            2.    *The Loss of Value in Plaintiffs' Homes Is an
                "Injury in Fact"* ................................................... 35

ii

(a)   The Loss of Value and Desirability of Plaintiffs' Homes as Places to Live Is an "Injury in Fact" ...................................................36

(b)   Depressed Resale Values Constitute an "Injury in Fact" Even When There Has Been No Sale ...............................................................42

*3.   Plaintiffs' "Injury in Fact" Does Not Depend on the Specific Nature of the Information Concealed or Misrepresented, But Rather on the Effect of the Fraud* ......................................................47

C.   Plaintiffs Adequately Plead a Harm "Fairly Traceable" to Defendants...........................................................49

D.   A Favorable Decision in This Case Will Redress Plaintiffs' Injury.......................................................57

E.   Plaintiffs' Standing Does Not Turn on Whether They Will Prevail or Can Prove Their Damages .........................58

II.   PLAINTIFFS HAVE STANDING TO SEEK THE OPTION TO RESCIND THEIR PURCHASES ................................................60

III.   THE DISTRICT COURT ERRED IN DENYING LEAVE TO REPLEAD .......62

CONCLUSION ...........................................................................65

CERTIFICATE OF COMPLIANCE ...............................................67

# TABLE OF AUTHORITIES

*Page*

## CASES

*Adarand v. Peña*, 515 U.S. 200 (1995).................................................27

*Allandale Neighborhood Ass'n v. Austin Transp., Study Policy Advisory Committee*, 840 F.2d 258 (5th Cir. 1988) .......................................43

*Alschuler v. Department of Housing and Urban Development*, 686 F.2d 472 (7th Cir. 1982) ........................................................................ 39, 44, 48

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment*, 189 F.3d 1017 (9th Cir. 1999)............................................................35

*Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006)..........59

*Bartleson v. U.S.*, 96 F.3d 1270 (1996) ........................................................ passim

*Bell v. Hood*, 327 U.S. 678 (1946)..........................................................58

*Blair v. Shanahan*, 38 F.3d 1514 (9th Cir. 1994).................................28

*Breiner v. Nevada Dept. of Corrections*, 610 F.3d 1202 (9th Cir. 2010)..........24

*Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906 (7th Cir. 2003).....................................................................59

*Buist v. C. Dudley De Velbiss Corp.*, 182 Cal.App.2d 325, 6 Cal.Rptr. 259 (1st Dist. 1960)......................................................... 32, 33, 48, 49

*Chappel v. Laboratory Corp. of America*, 232 F.3d 719 (9th Cir. 2000).........63

*Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961 (9th Cir. 2003)................................................................ 51, 57

*City of Los Angeles v. County of Kern*, 581 F.3d 841 (9th Cir. 2009).............26

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)....................................... 26, 27

*Coalition for Environment v. Volpe*, 504 F.2d 156 (8th Cir. 1974)........... 29, 40

*Coalition of Concerned Citizens Against I-670 v. Damian*, 608 F.Supp. 110 (S.D. Ohio 1984) ................................................. 44, 48

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2007)........................................60

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ...... 22, 57

*Davis v. Federal Election Com'n*, 128 S.Ct. 2759 (2008)...................................60

*Eminence Capital, LLC. v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) .........62

*Farrakhan v. Gregoire*, 590 F.3d 989 (9th Cir. 2010)........................................59

*Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263 (11th Cir. 2003)...........................................................................50

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) .........................................................................passim

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979).......... 38, 43, 48

*Graf v. Sumpter*, 207 Cal. App. 2d 391, 24 Cal. Rptr. 590 (1962)....... 32, 33, 49

*Green v. Beazer Homes Corp.*, 2007 WL 2688612 (D.S.C. Sept. 10. 2007)...............................................................................................................47

*Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217 (10th Cir. 2008).........50

*Harris v. Amgen*, Inc., 573 F.3d 728 (9th Cir. 2009)...........................................63

*Harzewski v. Guidant Corp.*, 489 F.3d 799 (7th Cir. 2007) ..............................59

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ....................................38

*Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) ..........................28

*In re Tobacco II Cases*, 46 Cal.4th 298, 207 P.3d 20 (2009)..............................52

*Kaing v. Pulte Homes, Inc.*, 2010 WL 625365 (N.D.Cal. Feb. 18, 2010) .........46

*Kelley v. Selin*, 42 F.3d 1501 (6th Cir. 1995)......................................................43

*Kirby v. U.S. Government, Dept. of Housing & Urban Development*, 675 F.2d 60 (3d Cir. 1982) ................................................................. 39, 43, 48

*Lewis v. Casey*, 518 U.S. 343 (1996) ............................................................ 29, 60

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................... 20, 26, 29, 49

*Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1 (1978) ..... 27, 59

*Mondragon v. Meritage Homes of California, Inc.*, 2010 WL 1972284 (Cal.App. 3 Dist. May 18, 2010)................................................................ 41, 42

*Native Village of Kivalina v. ExxonMobil Corp.*, No. C 08-1138, 2009 WL 3326113 (N.D. Cal. Sept. 30, 2009) ...........................................50

*Nat'l Treasury Employees Union v. Whipple*, 636 F.Supp.2d 63 (D.D.C. 2009) ...............................................................................50

*Nava v. City of Dublin*, 121 F.3d 453 (9th Cir. 1997) ........................................28

*Perez v. State Farm Mut. Auto. Ins. Co.*, 319 Fed.Appx. 615, 2009 WL 688983 (9th Cir. Mar. 17, 2009) .........................................................31

*Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co.*, 219 F.3d 895 (9th 2000)........................................................................26

*Phillips v. Frank*, 295 F.2d 629 (9th Cir. 1961)....................................................46

*Reed v. King*, 145 Cal.App.3d 261, 193 Cal.Rptr. 130 (1983) ............ 45, 49, 56

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004).......................24

*Sanfran Co. v. Rees Blow Mfg. Co.*, 168 Cal. App. 2d 191 (1959)...................32

*Shapiro v. Sutherland,* 64 Cal.App.4th 1534, 76 Cal.Rptr.2d 101 (1998) ............................................................................................. 42, 48

*Sierra Club v. Morton*, 405 U.S. 727 (1975)................................................. 26, 38

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ......... 58, 59

*Stop the Casino 101 Coalition v. Salazar*, 2010 WL 2530721 (9th Cir. Jun. 3, 2010) .........................................................................................44

*Teitel v. Wal-Mart Stores, Inc.*, 287 F.Supp.2d 1268 (M.D. Ala. 2003)...........44

*Tingley v. Beazer Homes Corp.,* 2008 WL 1902108 (W.D.N.C. April 25, 2008) ...............................................................................................47

*Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131 (3d Cir. 2009)............................................................................................50

*U.S. Parole Commission v. Geraghty*, 445 U.S. 388 (1980)..............................25

*United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669 (1973)........................................................25

*Weaver v. Aetna Life Ins. Co.*, 370 Fed.Appx. 822 (9th Cir. 2010)..................31

*Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004) ...................................... 24, 57

## STATUTES, RULES, AND REGULATIONS

28 U.S.C. § 1332................................................................................................2, 3

Calif. Civ. Code § 3343(a)...................................................................................31

Fed.R.Civ.Pro. 15...............................................................................................62

## CONSTITUTIONS

U.S. Constitution, Article III ......................................................................... 25, 27

## OTHER AUTHORITIES

Restatement (Second) of Torts § 546 .......................................................... 52, 53

## INTRODUCTION

Plaintiffs-Appellants ("Plaintiffs") in these eight consolidated cases alleged that they were defrauded in the purchase of their homes; they sought compensatory damages from the sellers and their affiliates, and the option to rescind their purchases.  The district court held that Plaintiffs lacked standing to pursue their claims.  This Court should reverse because it is axiomatic that Plaintiffs have standing to pursue these claims.

In dismissing the claims on the basis of standing, the district court fundamentally misconceived the standing inquiry. *No* precedent of which Plaintiffs are aware in this Court or in the United States Supreme Court holds that plaintiffs in a private lawsuit seeking their own damages for fraud based on misrepresentations made to them, arising from a purchase they themselves made, lack standing to do so and no aspect of the doctrine of standing suggests that there is any basis on which such plaintiffs could be found to lack standing.

Moreover, the district court's analysis rests on the erroneous assumption that whether a plaintiff has standing to sue for fraud depends on what the plaintiff alleges the defendant misrepresented.  While the merits of a fraud claim may indeed turn on that inquiry, a plaintiff's

1

standing to sue for fraud cannot turn on whether the court believes the misrepresentation at issue was actionable or whether the damages can be proven. The district court, however, believing that Plaintiffs would be unable to prove causation or damage, held that they had no cognizable injury and lacked standing. This was error. Plaintiffs have standing because they are alleging fraud in the purchase of *their own homes*, not some generalized societal or economic injury. This Court should reverse the judgment of the district court and hold that Plaintiffs have standing to pursue their claims.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction in each of the eight underlying cases under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Each case is pleaded as a class action. *See* FAC ¶¶ 51-60,[1] ER

---

[1] Unless expressly indicated otherwise, all citations to the "FAC" are citations to the First Amended Complaint in *Maya v. Centex Corp.*, docket number 10-55658 (Case number below: EDCV 09-01671 VAP (OPx)), the lead case in this Court. The First Amended Complaint in each of the other seven actions contains substantially identical allegations. When referencing the opinion of the district court, Appellants similarly cite to the Order Granting Defendants' Motion to Dismiss for Lack of Standing, with Prejudice, and Denying Defendants' Motion to Strike as Moot ("Opinion") entered in the *Maya* case. A substantially identical opinion was entered in each of the other seven cases.

273-77.[2] The amount in controversy in each case exceeds the sum or value of $5,000,000 exclusive of interest and costs, and there is minimal diversity because some members of the proposed class are citizens of a different state than any defendant as required by 28 U.S.C. § 1332(d)(2). *See* FAC ¶¶ 1-2, ER 259.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because Plaintiffs-Appellants in each of the eight cases timely appealed from a final judgment of the United States District Court for the Central District of California. The district court entered judgment in all eight cases on March 31, 2010. *See* ER 293, 332, 373, 411, 479, 516, 555, 595. Plaintiffs timely filed their Notices of Appeal on April 28, 2010. *See* ER 293, 332-33, 373, 412, 479, 516, 555, 595.

The district court dismissed each of the cases for lack of Article III standing, thus disposing of all issues and all claims in each of the cases.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Do plaintiffs seeking damages from the sellers for fraud in the purchase of their own homes have standing to assert their claims?

---

[2] "ER" refers to the Excerpts of Record filed by Plaintiffs-Appellants

3

2.     Do homeowners whose homes have lost value because of changes in the character of the neighborhoods where they live following large numbers of foreclosures in those neighborhoods have standing to seek damages from the homebuilders who misrepresented the character of the neighborhoods and failed to disclose the presence of large numbers of high foreclosure- risk buyers?

3.     Do homeowners have standing to sue for the difference between what they paid for their homes and what the homes were actually worth, where the builders who sold the homes misrepresented the character of the neighborhoods in which the homes were located?

4.     Did the district court err in refusing to give plaintiffs leave to amend their complaints where the court found that plaintiffs could not show a link between defendants' conduct and plaintiffs' injury and plaintiffs offered to plead additional facts or provide expert analysis showing that link?

## STATEMENT OF THE CASE

### Nature of the Case

This case arises from a massive fraud in the homebuilding industry whereby the Defendants, vertically-integrated homebuilding

4

conglomerates, built new developments, represented that they were creating traditional, stable neighborhoods with owner-occupied homes, and then filled the developments with high-foreclosure risk purchasers, including speculators and buyers whom the Defendants knew were poor credit risks. Plaintiffs are credit-worthy homeowners who purchased in these neighborhoods believing them to be the stable neighborhoods they were represented to be -- and paying prices commensurate with that kind of neighborhood.

Prices in a neighborhood of unqualified buyers and high-foreclosure risk owners are necessarily lower than in stable, traditional neighborhoods, to reflect the greater risk of the blight that large numbers of foreclosures and short-sales may bring: abandoned houses; multiple families living in one home; transient neighbors with no long-term ties to the neighborhood; unfinished and unkempt yards; and, in some cases, increased crime. *See* FAC ¶ 29, ER 267. By concealing the presence of significant numbers of such buyers in Plaintiffs' neighborhoods, Defendants were able to inflate prices beyond what such high-risk neighborhoods could command if qualified buyers who could buy elsewhere knew the truth. Defendants were selling high-risk junk bonds at triple-A prices.

When the real estate bubble burst, the truth was revealed: significant numbers of the homes in the neighborhoods were owned by just such high foreclosure-risk buyers and by speculators who walked away when prices fell. Plaintiffs' neighborhoods were hit by waves of foreclosures, as the unqualified buyers were unable to make their mortgage payments. Instead of the usual percentage of such misfortunes one might expect in the traditional, stable neighborhoods into which Plaintiffs thought they were buying, Plaintiffs found themselves instead surrounded by foreclosures and abandoned houses in sufficient numbers to transform completely the character of their neighborhoods. It was only then that the inflated prices, and the resulting damage, became clear.

Plaintiffs sued, on behalf of themselves and other creditworthy homebuyers like themselves who were similarly defrauded by Defendants, for the harm of living in neighborhoods that are less desirable than what had been represented and for the harm of having paid more than the homes were worth, given the true character of the neighborhoods. They alleged statutory claims for unlawful, unfair, and fraudulent business practices under California's Unfair Competition Law and for false advertising, as well common law claims sounding in fraud, negligent

misrepresentation, and breach of the covenant of good faith and fair dealing. They sought damages as well as the option to rescind the purchase of their homes.

The district court found that Plaintiffs lacked standing to pursue their claims. While the district court focused on the resale prices of Plaintiffs' homes – and the possibility that real estate prices would someday recover – in reality, Plaintiffs are suing for the inflated prices they paid for their homes and for the diminution of value in their homes *not* as financial instruments to be bought and sold but, rather, as places to live. The depressed value of their homes causes actual damage to Plaintiffs now, not merely the possibility of future damage when they resell. The actual, present damage comes not only from paying more than the market could ever have demanded if the true nature of the neighborhood had been disclosed, but also from the injury of living in less desirable neighborhoods than Plaintiffs were promised, and from the present lost value in the homes which can, *e.g.*, restrict willingness to sell or reduce access to credit because Plaintiffs' homes are worth less than they should have been. Alternatively, Plaintiffs seek to recoup the difference between what they paid for their homes and what the true value of the homes was at the time Plaintiffs

7

bought them, based on the actual character of the purchasers of the other homes in the neighborhood. Plaintiffs also seek the option to rescind their purchases altogether.

While real estate prices have fallen in many places, neighborhoods like the ones in which Plaintiffs live have been especially hard hit because the prices homeowners paid were set not merely by an exuberant economy, but inflated by fraud and misrepresentations about the character of what was being sold. As alleged in each of the First Amended Complaints, moreover, the damages that Plaintiffs suffered as a result of Defendants' fraudulent schemes can be ascertained and calculated separate and apart from any devaluation resulting from other economic factors such as unemployment trends and general market fluctuations. *See* FAC ¶ 34, ER 268-69. This is especially true because Plaintiffs did not merely see the value of their homes go up and then fall back down again, as happened to many homeowners. Rather, Plaintiffs purchased their homes from Defendants in reliance on Defendants' fraudulent misrepresentations, paid prices that would have been justified only if those misrepresentations had been true, and now suffer the damage of having bought homes in neighborhoods of entirely different character and value than what

Defendants sold them.   Plaintiffs have suffered actual injury and have standing to seek redress from the Defendants for their fraud.

## Course of Proceedings and Disposition Below

Each of the eight cases below was filed in the district court on September 3, 2009. Although the allegations in the cases were similar, reflecting similar or identical industry practices, each case named a different national home-building corporation and several of its subsidiaries and/or affiliates.   On October 23, 2009, Plaintiffs in the *Dodaro* action moved to consolidate the cases before a single judge; the motion was denied on November 16, 2009, but the judge agreed to accept assignment of all eight of the cases.  *See* ER 590, 592.

In December, 2009, with leave of court, all eight plaintiffs amended their complaints.   The court set a briefing schedule for the eight motions to dismiss the First Amended Complaints such that the briefing would be coordinated and the motions would be heard together at a single hearing on March 15, 2010.  The district court requested that the parties incorporate by reference arguments made in other briefs, so that the briefs would not be duplicative.

Defendants in each of the eight cases moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), asserting that Plaintiffs lacked standing to pursue their claims.[3]   Defendants also moved to dismiss under Rule 12(b)(6) for failure to state a claim and under Rule 9 for failure to state fraud claims with particularity.  Defendants in seven of the eight cases – each case except *Nielson v. Shea Homes*, EDCV-09-01673 – also moved to strike the class action allegations in the complaints.  The district court heard argument on all of the motions on March 15, 2010.

On March 31, 2010, the district court granted the motions to dismiss for lack of Article III standing.  The court did not reach the arguments concerning Rule 9 and Rule 12(b)(6) (including, as raised by some Defendants, whether Plaintiffs had statutory standing with respect to their claims that arose under California's Unfair Competition and False Advertising laws); it denied the motions to strike as moot.

---

[3] D. R. Horton, Inc., one of the defendants in *Martinez v. D. R. Horton, Inc.*, EDCV-09-01672, moved only on the ground that the court lacked personal jurisdiction over it.  At the hearing on March 15, 2010, D.R. Horton, Inc. chose to join in the motions to dismiss for lack of standing filed by the remaining defendants in that case.

Plaintiffs in each of the eight cases filed a Notice of Appeal on April 28, 2010. On July 15, 2010, this Court ordered that the eight cases be consolidated on appeal. At the same this, this Court declined to consolidate a ninth case, *Kaing v. Pulte Homes, Inc.*, Docket Number 10-15604. Because the *Kaing* appeal presents substantially identical issues on somewhat different facts, Plaintiffs respectfully request that this consolidated appeal and the *Kaing* appeal be heard together at oral argument.

## STATEMENT OF FACTS

Each of the First Amended Complaints alleged substantially similar practices in the business of developing, constructing, and selling new houses, as follows:

### Structure of Defendants' Business

Defendants in each case are in the business of developing, constructing, and selling new houses. FAC ¶ 12, ER 261. Traditionally, builders would obtain raw land and build houses on that property. Thereafter, separate and distinct companies would market and sell the houses, provide lending to new buyers, obtain the appraisals of property, obtain the insurance for the property, and obtain title services for the

11

property.  Over time, however, national builders such as Defendants conspired to increase sales of their houses by offering the aforementioned auxiliary services (lending, appraisals, insurance, title, etc.) through their own companies.  FAC ¶¶ 13-14, ER 261.  Sometime prior to 2004, Defendants expanded their home construction business to both market the houses to prospective buyers and provide to the buyers the services necessary for purchase, including real estate agent services, financing, and appraisals.  FAC ¶ 14, ER 261.

The defendants in each case included a Parent Corporation (generally, the first named defendant in each of the eight lawsuits) and several subsidiaries, including local homebuilding subsidiaries, and other LLC's and corporations that develop, construct, sell, and finance the new houses.  Together, the Parent Corporation and the affiliated subsidiaries created a "one-stop shopping" system in which home buyers dealt only with the Defendants at every stage of the process of purchasing their homes, so that at no point would an independent company review the credit-worthiness of the buyer or the valuation of the property.  *See* FAC ¶¶ 15-18, ER 261-64.

**Use of the Business Structure to Implement a Scheme to Increase Profits and Executive Compensation**

Beginning prior to 2004, the Defendants implemented a scheme to increase the number of houses sold and to increase the amount of profit per sale by marketing to, and financing, unqualified buyers who posed an abnormally high risk of foreclosure. At the same, Defendants represented to traditionally qualified and low-foreclosure-risk buyers that they were building traditional neighborhoods with stable owners who occupied their homes and who were vested in the community and neighborhood. Implicit in that marketing scheme was that Defendants were making a good-faith effort to sell homes to buyers that they expected could afford to buy the houses and would be stable neighbors. FAC ¶¶ 20-21, ER 264-65. Defendants correctly anticipated that their tactics would create "a buying frenzy" that would artificially increase demand and house prices, resulting in increased profits to Defendants. *Id.* at ¶ 22, ER 265.

Defendants suffered little, if any risk, from this strategy: they were able immediately to sell the loans they had underwritten to third-party banks and other financial entities. By the time the unqualified buyers defaulted on their loans, Defendants had taken their profit and moved on. *See* FAC at ¶ 24, ER 265.

13

In an attempt to disguise that these loans were for unqualified and high foreclosure risk borrowers, Defendants assisted and encouraged unqualified buyers to appear as qualified buyers by: (a) allowing and encouraging buyers to provide inflated stated and unverified income; (b) underwriting sub-prime loans for buyers with bad credit history; (c) not requiring any substantial down payment; (d) underwriting or securing piggyback loans for second mortgages so that the buyers did not make any real down payment; (e) financing buyers in adjustable loans (interest only or below in many cases) and qualifying these buyers on the artificially low initial payments; (f) providing cash "incentives" to buyers at the close of escrow if the buyers used Defendants' mortgage company to finance the house, thereby eliminating the requirement that buyers pay closing costs; and (g) obtaining inflated appraisals.  FAC ¶ 25, ER 266.

By financing these unqualified buyers, Defendants knowingly filled the neighborhoods they built with unqualified high-foreclosure-risk buyers surrounding the traditionally qualified and low-foreclosure-risk buyers. Defendants knew, or should have known, that a number of these unqualified buyers were counting on appreciation of their property to transform them into qualified buyers in the future.  These buyers presented

14

a high risk of foreclosure because if the property did not sufficiently appreciate, the buyers would not be able to refinance their loans and would not be able to afford to make their mortgage payments.  Defendants also knew, or should have known, that buyers requiring subprime loans because of bad credit history were high-foreclosure-risk buyers in any event.  Defendants further knew, or should have known, that buyers who were not financially vested in the house, because they did not have to make a substantial down payment or pay closing costs, are much more likely to "walk away" from the house with any downturn in housing prices, which again made these buyers high-foreclosure-risk buyers.  *Id.* at ¶ 26, ER 266.

Defendants also sold houses to another group of buyers who presented a high risk of foreclosure.  While representing that they were developing a stable neighborhood with owner-occupied houses and claiming to have procedures in place to prevent "investors" from buying the houses, Defendants were selling houses to buyers who they knew, or should have known, were investors who had no intention of occupying the houses.  These investors would then rent out the property which resulted in a less stable neighborhood, contrary to what was represented in the marketing and sales materials.  Even more importantly, because the house

was an investment and not a home, these buyers were more likely to "walk away" from the house with any downturn in housing prices, which made them high-foreclosure-risk buyers. *Id.* at ¶ 27, ER 267.

Defendants also knew, or should have known, that the presence of a large number of high-foreclosure risk buyers in the neighborhood was a materially important fact to buyers of their houses. Foreclosures and short sales (a lender-agreed sale below the principal of the loan) are devastating to both the value and desirability of a neighborhood. Foreclosures resulting in bank sales and short sales are usually well below market value. These foreclosure sales and short sales then become the new comparative sales values for the neighborhood, which result in a vastly lower market rate. This, in turn, triggers yet another round of foreclosures and short sales, resulting in a further decline in market value. Soon this cycle results in price free-fall for the houses in the neighborhood, materially affecting the value of those homes not subject to foreclosures or short sales. FAC ¶ 28, ER 267.

A significant number of foreclosures and short sales also have a significant effect on the desirability of a neighborhood. FAC ¶ 29, ER 267. As a result, houses in neighborhoods at risk of high rates of foreclosure

generally command lower prices than houses in stable neighborhoods. By concealing that they were selling significant numbers of houses to high-risk, un-creditworthy buyers, Defendants were able to sell their houses for more than the houses were worth given the true, but concealed, character of the neighborhoods in which they were located. *See* FAC ¶¶ 30-34, ER 267-69.[4]

### Plaintiffs' Injuries

Each of the named Plaintiffs in the eight underlying cases purchased a home from the homebuilders named as defendants in their case. Each of them borrowed no more than 80% of the purchase price of their home and each was a traditionally-qualified borrower. *See Maya* FAC ¶¶ 37-38, ER 270; *Martinez* FAC ¶ 34, ER 307-308; *Lumalu* FAC at ¶¶ 38-40, ER 347-48; *Kelly* FAC ¶¶ 39-40, ER 425-26; *Stephens* FAC ¶¶ 36-37, ER 386-87; *Oneto* FAC ¶¶ 37-39; ER 530-31; *Dodaro* FAC ¶ 35, ER 568; *Nielsen* FAC ¶ 35, ER 492-93. As a result of Defendants' scheme, Plaintiffs and those similarly situated were misled into purchasing homes they would not have

---

[4] That the neighborhoods in which the homes were located were themselves new was a factor in the success of Defendants' scheme, because there was no information available, outside of Defendants' misrepresentations, about the character of the neighborhoods.

purchased if there had been proper disclosure about the true character of the neighborhoods Defendants were building. *See* FAC ¶¶ 34, 49, ER 268-69, 272. Both the practice of financing unqualified buyers (which drove up demand and therefore prices), and the failure to disclose that practice (which led Plaintiffs to believe they were buying in stable, traditional neighborhoods), resulted in Plaintiffs paying inflated purchase prices for their houses; Plaintiffs paid more for their homes than the homes were worth at the time of the purchase, given the true nature of the neighborhoods in which they were located. *See* FAC ¶ 50, ER 272-73.

Eventually, the unqualified and high-foreclosure-risk buyers in Plaintiffs' neighborhoods began to default on their loans, leading to foreclosures, short sales, and significant numbers of rentals in what were supposed to be neighborhoods of owner-occupied homes. FAC ¶¶ 37-38, ER 270. These foreclosures and short sales of properties were significantly below market value and depressed the value of the houses of the qualified and low-foreclosure-risk buyers. A snowball effect of foreclosures and short sales then followed, each further depressing the market value of the neighborhoods. *See* FAC ¶ 33, ER 268.

Plaintiffs now live in neighborhoods substantially different than the ones that Defendants represented they were building.  Instead of being filled with owner-occupants, many of the homes in the neighborhoods are occupied by transient tenants; other homes are simply empty, in many cases abandoned.  To make matters worse, Plaintiffs did not pay bargain prices to live in these bargain neighborhoods – because Defendants were able successfully to conceal what they were doing, Plaintiffs paid inflated prices commensurate with the stable, traditional neighborhoods they thought they were getting.  They seek, on behalf of themselves and others similarly situated, to recoup the amounts by which they overpaid for their homes, to be compensated for the injury of living in homes substantially different in character from what they expected, to be compensated for the loss in value of their homes attributable to Defendants' fraud, and/or to rescind their purchases and get their money back.

## SUMMARY OF THE ARGUMENT

Plaintiffs have standing to seek damages for fraud in the purchase of their own homes.  Because Plaintiffs allege that they, personally, were defrauded by Defendants, who misrepresented the character of the neighborhoods they were building, and further allege that the value of

19

their own property has decreased, Plaintiffs have a concrete stake in the litigation sufficient to create a "case or controversy" within the meaning of Article III of the Constitution.

The three-part test for constitutional standing developed by the Supreme Court, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), is designed to identify when plaintiffs have a sufficiently concrete stake in a litigation. That test has three elements: (1) a non-hypothetical "injury in fact" to the plaintiff; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that a favorable decision will redress the injury. *Id.* Plaintiffs here meet all three elements.

Plaintiffs allege a non-hypothetical "injury in fact" in three ways. First, Plaintiffs have suffered injury because they were fraudulently induced to pay more for their homes than the homes were worth at the time of the purchase. Second, Plaintiffs have suffered injury because, as a result of Defendants' fraud, Plaintiffs' homes have less value as places to live in that they are located in less desirable neighborhoods than was represented. Third, Plaintiffs have suffered injury because the market value of their homes has declined and that decline has real and present consequences.

20

The district court erroneously believed that none of these injuries were cognizable unless and until Plaintiffs sold their homes. Decades of federal case law, however, recognizes that plaintiffs who allege a diminution in the value of their property have standing to sue without selling that property. California substantive law, too, recognizes that plaintiffs who have been induced to pay more than property is worth, who suffer ongoing diminished value, or whose property has reduced market value as a result of fraud, have suffered an injury and may be awarded damages to compensate them.

The district court also believed that only certain limited misrepresentations confer standing for fraud, but case law shows that any circumstances that cause a diminution in a plaintiff's property value can confer standing to seek redress, so long as the plaintiff's interest is specific and definite enough. This is true with respect to matters relating directly to plaintiff's property, but also with respect to uses of other neighboring property that impair the value of plaintiffs' property.

Plaintiffs properly allege that their injury was "fairly traceable" to Defendants' conduct. They allege that, but for Defendants' misrepresentations, they would not have purchased their homes and/or

21

they would not have paid inflated prices for their homes. This "transaction causation" was sufficient to satisfy the "fairly traceable" prong of the *Lujan* test, which requires only a low level of causation; it requires neither a showing that Defendants' conduct was the sole cause, nor a showing of proximate cause.

The district court erroneously required Plaintiffs to show that no other factors contributed to the decline in value of their homes, but Plaintiffs do not allege that Defendants' fraud is the sole cause of changes in real estate values in their neighborhoods. Instead, Plaintiffs specifically allege that expert analysis could differentiate the damages that Plaintiffs suffered as a result of Defendants' fraud from any decline in price attributable to other causes. The district court improperly disregarded this allegation because the court believed that no such expert analysis could pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This was improper not only because, at the pleading stage, Plaintiffs are not required to show that their expert witnesses will be acceptable under the Federal Rules of Evidence, but also because the question of differentiating the harm caused by Defendants' fraud from harms caused by other factors is a question of damages, not standing.

22

The third *Lujan* factor is also satisfied, because Plaintiffs' injury is clearly redressable. Plaintiffs seek monetary damage to compensate them for having paid too much for their property and for the dimished value of that property.

Separate and apart from Plaintiffs' claims for damages, the district court failed to consider Plaintiffs' standing to seek rescission of the contracts of purchase and sale for their homes. With respect to rescission, it is clear that the court's view that Plaintiffs would have to sell their homes in order to have standing could not possibly be the case. *All* rescission claims involve purchasers still in possession of their property and in a position to tender it back. The three *Lujan* factors are all satisfied with respect to the rescission claim: Plaintiffs allege that they were overcharged for their homes, that it was Defendants who misrepresented and concealed the truth and accordingly inflated the value of the properties; rescission would return Plaintiffs to the position they were in prior to the fraud, giving them back their money in exchange for a tender of the properties that were not as represented.

Finally, even if the district court had been correct in finding that Plaintiffs lacked standing --- and it was not – the court erred in refusing to

grant leave to amend when Plaintiffs made a specific offer that they would provide more detailed pleading and the expert reports decribed in the complaints, in order to demonstrate that they could document their injury. The district court disregarded this offer and dismissed Plaintiffs' claims with prejudice. This Court should reverse.

ARGUMENT

## I.   PLAINTIFFS HAVE STANDING TO SEEK DAMAGES

The sole basis on which the district court dismissed Plaintiffs' claims was the Plaintiffs' purported lack of constitutional standing.[5]  In so doing, the district court incorrectly applied the doctrine of standing to reach a result at odds with the jurisprudence of the United States Supreme Court and this Court.

---

[5]   This Court reviews a plaintiff's standing *de novo. Breiner v. Nevada Dept. of Corrections*, 610 F.3d 1202, 1206 (9th Cir. 2010).

As this Court has noted, "[a] Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  Although on a factual challenge, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment . . . [and] need not presume the truthfulness of the plaintiff's allegations," *id.*, on a *facial* challenge, this Court must "take the allegations in the plaintiff's complaint as true." *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  Here, Defendants' challenge was facial and the district court made no findings of fact. Accordingly, in this Court, the allegations in the Complaints are presumed to be true for purposes of determining whether Plaintiffs have standing.

A.    **Plaintiffs Have Standing Because They Have a Concrete Stake in this Litigation**

Article III of the constitution limits the judicial power of the federal courts to "case and controversies."  U.S. Constitution, Article III.  This requirement serves two purposes:  first, it ensures that questions are "presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process," and, second, it "defines the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government."  *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 396 (1980).  The requirement of standing thus ensures both concreteness of the dispute and the proper separation of powers among the branches of the federal government.  Neither of these concerns is implicated in this case, where Plaintiffs have a concrete stake in the litigation and no issue of separation of powers is presented.

With respect to the concreteness of the disputes, the Supreme Court has explained that the requirement of standing "serves to distinguish a person with a direct stake in the outcome of a litigation . . . from a person with a mere interest in the problem."  *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973).

25

The Court further elaborated in *Sierra Club v. Morton*, 405 U.S. 727, 731-32 (1975):

> Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such *a personal stake in the outcome of the controversy* as to ensure that the dispute sought to be adjudicated, will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.

(Emphasis added.) *See also Lujan,* 504 U.S. at 560 n.1 (for purposes of standing, particularized injury means "that the injury must affect the plaintiff in a personal and individual way"); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("Plaintiffs must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues'"). This Court, too, has held that "[Article III] standing concerns whether *the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy'* to which the federal judicial power may extend under Article III, § 2." *City of Los Angeles v. County of Kern*, 581 F.3d 841, 845 (9th Cir. 2009) (emphasis added); *accord Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co.*, 219 F.3d 895, 899 (9th Cir. 2000).

26

Here, there can be no doubt that Plaintiffs have a direct, concrete, and particularized stake in this litigation:  they seek to recover the amount by which they were overcharged in the purchases of *their own homes*.  They do *not* seek redress for misrepresentations to the public at large, nor for injury to the overall economy.  Rather, they allege that Defendants made misrepresentations to *them*, that *they* relied on those misrepresentations in purchasing their homes (to the extent reliance is an element of their claims), and that *they* have been injured by being induced, fraudulently, to buy those homes.  This kind of individualized private claim for damages virtually always confers Article III standing.  Indeed, the Supreme Court has frequently assumed that the existence of a claim for damages for injuries already suffered confers standing, so much that no further discussion of standing in that context is necessary.  *See Adarand v. Peña*, 515 U.S. 200, 210 (1995) ("fact of past injury . . . presumably afford[s] the plaintiff standing to claim damages"); *Lyons*, 461 U.S. at 129 (same); *Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 8-9 (1978) (although claim for injunctive relief was moot, "respondents' claim for actual and punitive damages" was sufficient to allow case to proceed).

This Court, too, has treated standing to assert a claim for damages as a matter of course, even as it has reversed course about whether such standing is sufficient to confer standing with respect to a companion claim for forward-looking *equitable* relief. *Compare Nava v. City of Dublin*, 121 F.3d 453 (9th Cir. 1997) (defendant "could not successfully, argue that [plaintiff] lacked standing to seek damages"); *Blair v. Shanahan*, 38 F.3d 1514 (9th Cir. 1994) (claim for damages may confer standing to seek equitable relief because "the presence of a claim for damages, if it rests on identical facts and legal theories as the claim for equitable relief, guarantees that the plaintiff has a personal stake in establishing the facts and legal theories underlying the claim for equitable relief as well"); *with Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (over-ruling *Nava* and *Blair*, holding that standing to seek damages does not confer standing to seek equitable relief, but continuing to assume that plaintiffs would have standing to seek damages).

That Plaintiffs have a concrete stake in this litigation is also evident in the application of the Supreme Court's three-element test to analyze Article III standing; that test requires (1) a non-hypothetical "injury in fact" to the plaintiff; (2) a causal connection between the injury and the challenged

28

conduct; and (3) a likelihood that a favorable decision will redress the injury. *Lujan*, 504 U.S. at 560-61. This test is intended to identify those cases in which a plaintiff has a sufficient stake in the litigation to make out a concrete case or controversy that can properly be adjudicated by a federal court. *See Coalition for Environment v. Volpe*, 504 F.2d 156, 165 (8th Cir. 1974) ("requirement of injury in fact assures complainants have the personal stake and interest that impart the concrete adverseness required by Article III"). Although a plaintiff must meet all the requirements of this test – and, as we now show, Plaintiffs in these cases do -- it should not be forgotten that the fundamental purpose of the analysis is to ensure the concreteness of the dispute and the stake in the case necessary constitute a judicial "case or controversy."[6]

### B.   The Complaints Allege Sufficient "Injury in Fact" to Meet the Requirements for Standing

Plaintiffs seek damages for misrepresentations made to them when they purchased their homes. The injuries they allege are (a) as a result of Defendants' misrepresentations, Plaintiffs paid more for their homes than

---

[6] The role of standing in maintaining the separation of powers is not implicated in this case, where government action is not at issue. *See Lewis v. Casey*, 518 U.S. 343, 349-50 (1996) (explaining role of Article III in delineating the boundaries between the branches of government).

the homes were worth; and (b) the homes they have purchased are (i) less desirable, and (ii) have lost value, because the neighborhoods in which the homes are located are of a different, and less desirable, character than what Defendants represented when they sold the properties.  These injuries are sufficiently concrete and particularized to confer standing to sue.

> ### 1.     *Plaintiffs' Allegations that They Were Defrauded into Overpaying for Their Homes Plead an "Injury in Fact"*

The district court held that Plaintiffs' allegations that they overpaid for their homes were speculative and conjectural; this was based on a fundamental misunderstanding of Plaintiffs' claims and of the requirements for standing.

The district court appeared to believe that Plaintiffs' claims of overpayment depended in some way on the current values of their homes, when in fact Plaintiffs alleged that they paid more than the homes were actually worth *at the time of the sale*, based on Defendants' misrepresentations about the neighborhoods in which the homes were located.[7]   As a result, Plaintiffs' injury was complete as soon as they

---

[7] Plaintiffs alleged that, by manipulating the market for their homes, *i.e.*, increasing demand by selling to and financing high-risk buyers and investors, the purchase price paid by Plaintiffs and the Class was

(footnote continued on next page)

purchased their homes.  It is not speculative or conjectural, because it does not depend in any way on future events.  *See Perez v. State Farm Mut. Auto. Ins. Co.*, 319 Fed. Appx. 615, 2009 WL 688983 (9th Cir. Mar. 17, 2009) (alleged overcharges in insurance premiums are a "concrete, particularized, and actual injury-in-fact" regardless of whether plaintiffs ever had need to use the inferior repair parts that were the basis of their claim for overcharges); *see also Weaver v. Aetna Life Ins. Co.*, 370 Fed.Appx. 822 (9th Cir. 2010) (plaintiff lacked standing because, among other deficiencies, she "did not allege . . . that policy . . . was worth less than [she] paid for it . . .").

California law specifically recognizes a claim for overpayment at the time of sale.  California Civil Code § 3343(a) provides that: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction. . . .."  The

---

artificially inflated and had Defendants disclosed their fraudulent scheme, Plaintiffs "would not have paid an inflated price for the house."  FAC ¶49, ER 272.

measure of damages is based on the actual value at the time of the purchase. *See Graf v. Sumpter*, 207 Cal. App. 2d 391, 24 Cal. Rptr. 590 (1962); *Buist v. C. Dudley De Velbiss Corp.*, 182 Cal.App.2d 325, 6 Cal.Rptr. 259 (1st Dist. 1960); *Sanfran Co. v. Rees Blow Mfg. Co.*, 168 Cal. App. 2d 191 (1959). As the court explained in *Graf*:

> In general, damages for fraud are to be assessed as of the date of the fraudulent transaction . . . . That would be the date of the contract by which plaintiffs' right to the property and their obligation to pay therefor became fixed.
>
> . . . .
>
> We conclude that the value of what plaintiffs contracted to buy must be computed at the market existing on the date of the contract of purchase and sale. Subsequent appreciation of value due to increase in market prices in the area generally should not be charged to plaintiffs. Rather, without any infringement upon the "out of pocket" rule established by section 3343, they are entitled to the benefit of any increase in the value of the land after they became its equitable owners.

207 Cal. App. 2d at 393, 24 Cal. Rptr. at 592.

In *Graf*, plaintiffs alleged that the house they bought was worth less than represented because it was built on filled land that had not been properly compacted. Plaintiffs were, apparently, still in possession of the house. The issue for the appellate court was whether the damages had been correctly computed. There was evidence that the value of the house had *increased* between the time of the initial contract and the time the sale

was completed, but it was unclear from the trial record when the sale had actually occurred and whether the appreciation in the value of the property had occurred before or after the sale. The court remanded for a proper computation of damages, to be computed as the difference between the purchase price and the actual value of the property at the time of the sale. 207 Cal.App.2d at 393-94, 24 Cal.Rptr. at 592.

The plaintiffs in *Buist* also alleged that the house they purchased was built on improperly-compacted fill and that this fact had been concealed from them. The trial court determined that, in light of its location and the improper fill, the house had *no* value and awarded plaintiff the full purchase price plus the amount plaintiff had spent trying, unsuccessfully, to repair the defect in the property. The defendant argued that the plaintiff should not have been permitted to both recover the full purchase price and also retain the property. 182 Cal.App.2d at 333, 6 Cal.Rptr. at 264. The court held "[i]t is hornbook law that one who has been defrauded may elect to rescind the contract or to affirm it, retain what he has received and sue for damages for fraud." 182 Cal. App. 2d at 333, 6 Cal. Rptr. at 264. The court found the award proper in light of the nominal value of the property, because the plaintiffs were not in fact rescinding, but merely

recovering their damages.  The fact that no loss had been "realized" through subsequent sale did not prevent the court from recognizing that plaintiffs had been injured because the house they bought was not what it was represented to be.

Accordingly, it is clear that, under the substantive law applicable to Plaintiffs' claims, subsequent fluctuations in the market do not affect a defrauded buyer's remedy or damages and the property need not be sold in order for the buyer to be injured.  Rather, the law recognizes that the buyer's injury is complete at the time of purchase, regardless of subsequent developments.

If the district court were correct, and a plaintiff's standing to sue for fraud depended on a "realized" loss, in the sense of a re-sale, then a buyer of a "diamond" that turned out to be a cubic zirconium would lack standing to sue for the price difference between diamonds and cubic zirconia until the fake stone was sold, because of the possibility that the price of the fake might go up.  Similarly, a purchaser of securities who bought stock in a company in reliance on misrepresentations about the value of the company, would lack constitutional standing to sue under the securities laws for fraud until the stock was sold.  That is not the law.  *See,*

*e.g., Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment*, 189 F.3d 1017 (9th Cir. 1999) (securities plaintiff who still owned securities could receive as damages either difference between what it paid and value of what it received, or return of purchase price, but latter measure would require it to tender back securities).

### 2.    The Loss of Value in Plaintiffs' Homes Is an "Injury in Fact"

Plaintiffs also pleaded an "injury in fact" with respect to the loss of value in their homes. As with Plaintiffs' claims that they overpaid, the district court found that Plaintiffs lacked standing because they had not sold their homes. According to the district court, this made the Plaintiffs' injury conjectural and speculative. This conclusion was erroneous and reflected a fundamental misunderstanding of Plaintiffs' claims.

In holding that Plaintiffs' injury was unrealized, and therefore not concrete, the district court focused solely on a theoretical difference between the price Plaintiffs paid for their homes and the price they could receive in the market at the time they commenced this litigation. But the injury that Plaintiffs alleged was only tangentially related to the diminished resale value of their homes. Rather, Plaintiffs alleged a diminution in the value and desirability of their homes *as places to live*, not

35

as mere assets to sell.  In addition, as discussed below, to the extent that Plaintiffs do allege a change in resale prices (as opposed to a change in the value of the homes as places to live), courts have recognized that depressed housing prices have sufficient injurious effect on unsold properties to confer standing on the owners of such properties with respect to that loss of value.  *See* Point IB2(b), *infra*.

> (a)  The Loss of Value and Desirability of Plaintiffs' Homes as Places to Live Is an "Injury in Fact"

Plaintiffs alleged that, as a result of Defendants' scheme and the foreseeable foreclosures and short sales that followed, the "desirability of Plaintiffs' properties and the . . . neighborhoods has been drastically altered and reduced."  FAC  ¶ 50, ER 272-73; *see also* FAC ¶ 29, ER 267 (describing ills of high-foreclosure neighborhoods).  That injury had already been realized, and was ongoing, at the time Plaintiffs commenced their lawsuit. The district court's error was that it treated the only "value" to Plaintiffs' homes as their re-sale value, as if the homes were financial instruments, with no other purpose or intrinsic value than to be bought and sold.  But Plaintiffs purchased their homes in order to live in them and the primary value of those homes is in Plaintiffs' use and enjoyment of them.  It is in this use and enjoyment that Plaintiffs suffered injury, because a significant

portion of the value of the homes was in the kinds of neighborhoods in which they were located, and those neighborhoods turned out to be quite different than Defendants had represented them to be.

The district court was similarly off-base in finding that Plaintiff's injury was speculative because the real estate market might recover. Here, too, the court looked only at the difference between the purchase price of the homes and a theoretical selling price. Because the selling price might go up by the time Plaintiffs actually sold their homes, the court found that any injury alleged was purely speculative. Once again, the district court missed the point: Plaintiffs' loss was not speculative, because Plaintiffs are not suing for some loss in the selling price they might (or might not) suffer in the future. Rather, Plaintiffs are suing for injury they are already suffering by living in neighborhoods blighted by large numbers of foreclosures. There is nothing speculative about the reality of Plaintiffs' everyday lives in unstable, high-crime neighborhoods that had been represented to be of an entirely different character.

This kind of injury is recognized by both federal and state law. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), the Supreme Court had occasion to assess the injury in

37

fact requirement, as guided by its earlier *Lujan* framework.  It held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened.'" 528 U.S. at 183, *citing Sierra Club*, 405 U.S. at 735.  If the loss of "aesthetic and recreational values" from changes around a property constitutes an injury in fact, then surely the changes in Plaintiffs' neighborhoods do as well.

Numerous cases, moreover, recognize that undesirable changes to the character of a neighborhood constitute injury to residents of that neighborhood sufficient to confer Article III standing.  In *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 111-12 (1979), for example, the Supreme Court held that the loss of "the social and professional benefits of living in an integrated society" was sufficient injury to confer standing on neighborhood residents.  The Court noted in particular that "adverse consequences attendant upon a 'changing' neighborhood can be profound."  *Id.* at 110. *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376 (1982) (plaintiffs alleged sufficient injury-in-fact where they claimed that racial steering "deprived them of the right to the important social, professional, business and economic, political and aesthetic benefits

38

of interracial associations that arise from living in integrated communities free from discriminatory housing practices.") (internal quotations omitted).

In *Alschuler v. Department of Housing and Urban Development*, 686 F.2d 472, 476 (7th Cir. 1982), the Seventh Circuit found allegations of "an increase in crime," "added strain on community resources" and an adverse effect on the "property values and the special environmental, recreational, cultural, historical and aesthetic qualities" of their neighborhood sufficient to confer standing on neighborhood homeowners. The court noted that, at the pleading stage, those allegations of injury had to be accepted as true. *Id.; see also Kirby v. U.S. Government, Dept. of Housing & Urban Development*, 675 F.2d 60 (3d Cir. 1982) (allegation that neighborhood would be blighted by additional commercial properties and associated traffic adequate to establish injury in fact). Indeed, even where plaintiffs do not own the land affected by the defendants' conduct, federal courts have found sufficient injury in fact where plaintiffs alleged a specific use of land that would be impaired. *See Friends of the Earth*, 528 U.S. at 183 (diminished recreational use); *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 785 (9th Cir. 2008) (plaintiffs who alleged they would use city park facilities but for discriminatory policies of entity that operated the

facilities, had standing because of "both personal emotional harm and the loss of recreational enjoyment" of the property); *Coalition for Environment*, 504 F.2d at 166-67 (loss of "aesthetic and psychological benefit" of viewing open space sufficient injury in fact).

California law similarly recognizes that real estate buyers suffer when the enjoyment of their property is impaired. Thus, in *Bartleson v. U.S.*, 96 F.3d 1270 (9th Cir. 1996), plaintiffs purchased land adjacent to a military base. The sellers failed to disclose that the property was frequently shelled by training operations at the base. This Court, applying California law, affirmed the trial court's finding that plaintiffs were entitled to damages for "diminution in their property values." 96 F.3d at 1275. Plaintiffs still owned the property; their damages were computed through expert testimony about the diminished value of the property, including conflicting views about whether the purchase price already reflected the reduced value caused by the shelling. This Court affirmed an award of $60,000 in reduced value to the property.

In *Mondragon v. Meritage Homes of California, Inc.*, 2010 WL 1972284 (Cal. App. 3 Dist. May 18, 2010),[8] plaintiffs alleged they were defrauded in purchasing their homes because defendants concealed from them the extent of noise and dust from an adjoining lumber mill and concealed that the lumber mill had an easement to emit noise, dust, and odor onto the adjoining properties.  Although the court affirmed the dismissal of the claims, it did so on the basis that the easement was a matter of public record and the operations of the lumber mill had been disclosed in writing in the purchase agreement.  The court addressed the plaintiff's claims on the merits; the plaintiff's right to seek relief was never at issue.

*Mondragon* and *Bartleson* are especially significant because in both cases, as here, the misrepresentations pertained to nearby properties, but affected the value of Plaintiffs' property.  In both cases, plaintiffs alleged that their property was worth less than represented, and was a less desirable place to live or spend time, because of the true nature of the adjoining property, and in both cases plaintiffs still owned the property.

---

[8] *Mondragon* is an unpublished decision of the California Court of Appeals, not citeable in California state courts.

Although neither case addresses the question of standing, both proceed with the understanding that plaintiffs are suing for actual injuries they have suffered, an injury that the *Bartleson* court found warranted an award of damages; the *Mondragon* court no doubt would have reached the same conclusion had it not ruled that plaintiffs were on notice of the problem in the neighborhood before they bought their home. *See also Shapiro v. Sutherland,* 64 Cal. App. 4th 1534, 76 Cal. Rptr. 2d 101 (1998) (home purchaser permitted to seek damages and rescission where seller failed to disclose the fact that next-door neighbors were, over a period of years, a "source of disturbing noises and commotion.").

In this context, Plaintiffs' allegations that the value of their property had been impaired because of concealed facts about the character of the neighborhood did not represent a novel theory or an intangible, unrealized injury, but simply an impairment to the value of property similar to that routinely recognized in the case law.

(b)     Depressed Resale Values Constitute an "Injury in Fact" Even When There Has Been No Sale

Although Plaintiffs have suffered an "injury in fact" separate and apart from the depressed resale values of their homes, it is also true that depressed resale values in and of themselves have been recognized to be

sufficient "injury in fact" to confer standing.  Thus, in *Gladstone Realtors*, the Supreme Court held:

> [C]onvincing evidence that the economic value of one's own home has declined as a result of the conduct of another certainly is sufficient under Art. III to allow standing to contest the legality of that conduct.

441 U.S. at 115.  Similarly, in *Allandale Neighborhood Ass'n v. Austin Transp., Study Policy Advisory Committee*, 840 F.2d 258, 262 (5th Cir. 1988), the Fifth Circuit found unrealized property devaluations sufficient injury to confer standing because "a market devaluation has present adverse consequences short of realization through sale."  The *Allandale* court noted, as examples, that the fact of reduced prices has immediate effect on the owner's willingness to sell and on the ability of a homeowner to obtain a loan.  *Id.* at 262-63.  The court accordingly held that an "allegation of presently depressed property value" was "a sufficient injury for the purposes of constitutional standing."  *Id.* at 262.  *See also Kirby*, 675 F.2d at 64 (allegation of financial and nonfinancial harm to neighborhood based on decreased residential property value and blight of additional commercial property satisfies injury-in-fact requirement); *Kelley v. Selin*, 42 F.3d 1501, 1509 (6th Cir. 1995) (individual landowners' allegations of not only "harm to their aesthetic interests and their physical health, but … also

43

… that the value of his or her property will be diminished by the storage of nuclear waste [at the site]" had standing to challenge proposed nuclear waste storage protocol); *Alschuler,,* 686 F.2d 472, 476-77 (7th Cir.) (allegation of adverse effect on property values, along with increased crime, diminished environmental, recreational, aesthetic qualities of neighborhood, sufficient to confer Art. III standing); *Coalition of Concerned Citizens Against I-670 v. Damian,* 608 F.Supp. 110, 121 (S.D. Ohio 1984) (individual had standing to challenge proposed highway construction project based on his trial testimony that the project "would cause a loss of valuation of his property" and "would cause loss to him in terms of the aesthetic value he places upon his community."); *Teitel v. Wal-Mart Stores, Inc.,* 287 F.Supp.2d 1268, 1285 (M.D. Ala. 2003) (defendant's alleged fraudulent behavior resulting in plaintiffs' diminished property value or loss of financial gain stated "actual concrete particularized" injury); *cf. Stop the Casino 101 Coalition v. Salazar,* 2010 WL 2530721 (9th Cir. Jun. 3, 2010) (plaintiff lacked standing where, among other deficiencies, it "did not plead current depreciation of property value."). None of these cases involved property that had been sold.

California law, moreover, permits a property owner to sue for the reduced resale value of the property, even though the property has not yet been sold. *See Reed v. King*, 145 Cal. App. 3d 261, 193 Cal. Rptr. 130 (1983) (plaintiff permitted to sue for pecuniary harm reflected in reduced market value of property where the seller had failed to disclose that a gruesome quintuple murder had occurred on the premises).

Here, too, Plaintiffs have alleged that depressed resale values have a present and ongoing effect on the neighborhoods in which they live. *See Dodaro* FAC ¶¶ 31, 47, ER 566, 570; *Kelly* FAC ¶¶32, 52, ER 423, 428; *Lumalu* FAC ¶¶34, 52, ER 345, 350; *Martinez* FAC ¶¶30, 46, ER 306, 309-10; *Maya* FAC ¶¶ 33, 50, ER 268, 272-73; *Nielson* FAC ¶¶31, 47, ER 490-91, 495; *Oneto* FAC ¶¶33, 51, ER 527, 532; *Stephens* FAC ¶¶32, 48, ER 384, 388-89]. Their injury is concrete and actual even though they have not re-sold their homes.

The district court, however, held that Plaintiffs' loss (or gain) in property value was "conjectural" and "cannot be ascertained, nor measured, unless and until the owner sells the house." Opinion at 13, ER 13. This is simply not supported by the extensive case law recognizing injury to the value of property that has not been sold. The district court

45

cited *Phillips v. Frank*, 295 F.2d 629, 632 (9th Cir. 1961), as "recognizing that a gain or loss in real property cases is determined at the time of sale." *Phillips*, though, has nothing whatsoever to do with Article III standing and can in no way undercut the authority noted above which does deal with standing.[9]

The district court, relying on a trio of erroneously-decided district court cases, also misapprehended Plaintiffs' allegations about the diminution in the prices of their homes. The court mistakenly assumed that the reduced market prices of Plaintiffs' homes were attributable solely to over-building, to a glut of housing that depressed prices. *See* Opinion at 16, ER 16; *see also Kaing v. Pulte Homes, Inc.*, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010); *Tingley v. Beazer Homes Corp.*, 2008 WL 1902108 (W.D.N.C.

---

[9] *Phillips* addresses the tax treatment (under the tax laws existing a half-century ago) for a cash-basis taxpayer accorded to investments in real estate contracts with deferred income streams. Further, it is questionable whether *Phillips* "recognizes" the proposition for which the district court cited it; rather, in *Phillips*, this Court merely noted "a line of cases" (dating to the 1920s) holding that property "gain or loss on the sale" is calculated by assigning a fair market value as of the time of sale to the note or mortgage received for the property. *Phillips*, 295 F.2d at 632. While *Phillips* is inapposite for all of the reasons discussed, it is worth noting that, even in rendering its decision in that case, this Court elected not to follow the "line of cases" described. *Id.* at 633-34.

April 25, 2008); *Green v. Beazer Homes Corp.*, 2007 WL 2688612 (D.S.C. Sept. 10. 2007).  For this reason, the court believed that Plaintiffs could avoid a loss altogether merely by not selling during the glut, when prices remain low.  Opinion at 16, ER 16.  But that is not what Plaintiffs allege. Rather, Plaintiffs allege that their homes lost value because, unbeknownst to them, Defendants filled their neighborhoods with high foreclosure risk buyers; the presence of these high-risk buyers, as well as the foreclosures, short sales, and transients that followed, caused the loss of value in Plaintiffs' homes.  Plaintiffs do not need to sell their homes to suffer from that injury.  That real estate prices may have fallen elsewhere as well, due to over-supply or other causes, does not alter that Plaintiffs do not allege that *their* homes lost value because of an overall glut of housing.

### 3. *Plaintiffs' "Injury in Fact" Does Not Depend on the Specific Nature of the Information Concealed or Misrepresented, But Rather on the Effect of the Fraud*

The district court suggested that "injury in fact" arising from a misrepresentation in the purchase of property depends on the nature of what is misrepresented or concealed, but no authority supports that proposition.  The court suggested that standing to seek redress for fraud is limited to situation in which what was misrepresented was (1) a *physical*

defect of the property or (2) what the district court referred to as "highly unusual" cases of "extreme stigma." Opinion at 22, ER 22. But in every case where property owners have alleged that information concealed, or changes in circumstances, reduced the value of their property, the injury is the same: the reduction in the value of the property. (In a fraud case, it is true, the nature of the information withheld would, of course, determine whether the seller was required to make the disclosure, and thus the plaintiff's ultimate right to recover, but the *injury* is the same regardless.)

Thus, as described above, federal case law relating to standing, as well as California law governing suits for fraud in the sale of real property, recognize that injury to the value of property can arise from a broad range of factors – environmental damage, *see, e.g, Friends of the Earth*, 528 U.S. 167; new residential or commercial construction in the neighborhood, *see, e.g., Alschuler*, 686 F.2d 472; *Kirby,* 675 F.2d 60; racially discriminatory housing policies, *see, e.g., Gladstone Realtors*, 441 U.S. 91; noisy or obnoxious neighbors, *see Shapiro,* 64 Cal. App. 4th 1534, 76 Cal.Rptr. 101; highway construction, *see Coalition of Concerned Citizens Against I-670 v. Damian*, 608 F.Supp. 110; nearby artillery fire, *see Bartleson,* 96 F.3d 1270; poor construction, *see, e.g., Buist,* 182 Cal. App. 2d 325, 6 Cal. Rptr. 259; or

even a gruesome history, *see Reed,* 145 Cal. App. 3d 261, 193 Cal. Rptr. 130. Indeed, in most of these cases, the injury to the value of the property is *not* a physical defect nor a "highly unusual" "extreme stigma."  Fraud can occur with respect to the character of the property being sold, as in *Buist,* 182 Cal. App. 2d 325, 6 Cal. Rptr. 259, *Graf,* 207 Cal App. 2d 391, 24 Cal. Rptr. 590, and *Reed,* 145 Cal. App. 3d 261, 193 Cal.Rptr. 130, or it may relate to neighboring properties, as in *Bartleson,* 96 F.3d 1270, and, as the standing cases discussed demonstrate, cognizable injury to an interest in property most frequently arises from the use being made of other nearby properties, rather than from activities occurring on the plaintiff's property itself.  It is the alleged *effect* of the fraud, causing Plaintiffs to pay too much for property, or reducing the value of the property, that determines the "injury in fact."

### C.  Plaintiffs Adequately Plead a Harm "Fairly Traceable" to Defendants

Plaintiffs also adequately allege that their injuries are "fairly traceable" to the Defendants' conduct.  *Lujan,* 504 U.S. at 560 (citation omitted).  Although "Article III does require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact," "the 'traceability' of a plaintiff's harm to the defendant's actions need not

rise to the level of proximate causation." *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008); *accord Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131 (3d Cir. 2009) (for purposes of standing, "causal connection need not be as close as the proximate causation needed to succeed on the merits of a tort claim. . . . Rather, an indirect causal relationship will suffice"); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263 (11th Cir. 2003) (because "no authority even remotely suggests that proximate causation applies to the doctrine of standing," in assessing standing "we are concerned with something less than the concept of 'proximate cause.'"); *Nat'l Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63 (D.D.C. 2009) ("Causation [for purposes of standing] does not require that the "challenged action must be the 'sole' or 'proximate' cause of the harm suffered, or even that the action must constitute a 'but-for cause' of the injury. . . . At its core, the causation inquiry asks whether 'the agency's actions materially increase[d] the probability of injury); *Native Village of Kivalina v. ExxonMobil Corp.*, No. C 08-1138, 2009 WL 3326113, at *10 (N.D. Cal. Sept. 30, 2009) (traceability need not rise to level of proximate cause). Indeed, the term "fairly traceable" itself implies a relatively low standard of causal

connection to qualify for standing. *See Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 975 (9th Cir. 2003) (causation element of standing "is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant").

Here, the causal connection between Defendants' conduct and Plaintiffs' injury, in the sense it is required for Article III standing, is plain. Plaintiffs allege that Defendants made misrepresentations to them and that, as a result of Defendants' misrepresentations, they were induced to pay more for their homes than the homes were worth. Plaintiffs also allege that Defendants filled their neighborhoods with high risk buyers and that the presence of these high-risk homeowners caused the decline in value of Plaintiffs' homes. There is nothing tenuous about the connection between Defendants' conduct and Plaintiffs' injury: but for Defendants' misrepresentations, Plaintiffs would not have purchased their homes, nor paid the prices they paid for them. *See* FAC ¶¶ 68, 77, 82, 89, ER 279-80, 282. That is sufficient to confer standing.

Indeed, in order to *prevail* on their claims, Plaintiffs need show no more. As the California Supreme Court has explained:

> A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's

conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct.

While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. It is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct. It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision.' Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material.

*In re Tobacco II Cases*, 46 Cal. 4th 298, 326-27, 207 P.3d 20, 39 (2009) (citations omitted). The Restatement of Torts similarly explains that a fraud plaintiff need only show that he or she would not have entered into the transaction but for the defendant's misrepresentation: "If the misrepresentation has in fact induced the recipient to enter into the transaction, there is causation in fact of the loss suffered in the transaction." Restatement (Second) of Torts § 546. The Restatement also acknowledges that

It is not . . . necessary that [plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. It is not even necessary that he would not have acted or refrained from acting as he did unless he had relied on the misrepresentation. *It is enough that the representation has*

> *played a substantial part, and so has been a substantial factor,*
> *in influencing his decision.*

*Id.* (emphasis added; citation omitted).

To demonstrate that their injury is "fairly traceable" to Defendants' conduct for purposes of standing does not require Plaintiffs to meet a higher standard of causation than they would have to do to prevail on their claims. In *Friends of the Earth*, for example, plaintiffs submitted a sworn statement in which the witness attested that "her home, which is near Laidlaw's facility, had a lower value than similar homes located farther from the facility, and that *she believed the pollutant discharges accounted for some of the discrepancy*." 528 U.S. at 182-83 (emphasis added). This was sufficient to confer standing, even though no attempt was made to claim that all of the lowered value was attributable to defendants' conduct.

The district court, however, found that Plaintiffs could not satisfy the "fairly traceable" requirement because "any loss in value Plaintiff has suffered resulted not just from the actions of Defendants, but also from the independent actions of others . . . ." Opinion at 24, ER 24. Thus, the district court erroneously required Plaintiffs to show that Defendants were the *sole* cause of Plaintiffs' injury.

53

This was error in any case, but especially troubling in the context of Plaintiffs' allegations that they paid more for their homes than the homes were worth in light of the true character of the neighborhoods in which they are located. The district court apparently believed that the independent actions of others, in defaulting on their loans, for example, somehow contributed to Plaintiffs' injury. Opinion at 29, ER 29. But as explained above, Plaintiffs' injury in paying more than their homes were worth was complete as soon as the homes were purchased, although it took a while for Plaintiffs to discover truth. The independent actions of others had nothing to do with the fact that Defendants sold homes in neighborhoods of un-creditworthy, high foreclosure-risk buyers and investors, but charged prices commensurate with homes in the stable neighborhoods they misrepresented they were creating. With respect to Plaintiffs' allegations of overpayment, Defendants were indeed the sole cause of Plaintiffs' injury.

Rather than focus on the causal connection between Defendants' fraud and Plaintiffs' *purchase* of their homes, however, the district court required Plaintiffs to show that Defendants' fraud was the sole cause of the decline in the *resale value* of Plaintiffs' homes. This made little sense, for

two reasons.  First, Plaintiffs are not suing to recover the difference between the purchase price and the resale value, but rather for the difference between what they paid and what their homes were worth at the time, or for the decline in the value of the homes as places for Plaintiffs to live.  Second, if the court were correct, no one could be defrauded in a recession, because some portion of any decline in prices will be attributable to general economic conditions.  An overall decline in prices is not a general amnesty for fraudsters.  Moreover, neither the substantive law nor the law of standing requires Plaintiffs to link each element of their damages to Defendants' conduct.  Here the link between the purchase of Plaintiffs' home and Defendants' conduct is apparent and straightforward. For this reason, Plaintiffs' injury is "fairly traceable" to the Defendants sufficient to establish a "case of controversy."

To be sure, in order to prove their damages, Plaintiffs may have to prove the true value of their homes at the time of the misrepresentations; to the extent that current market values are used in such computations, Plaintiffs would have to differentiate the fall in housing prices that occurred generally from the fall in the price of Plaintiffs' homes attributable to Defendants' conduct.  To prove damages for loss of value in their homes,

they may have to demonstrate what portion of the change in the market value of their homes was due to Defendants' conduct. But those are issues of damage computation, not causation. *See, e.g., Bartleson*, 96 F.3d at 1278 (affirming computation of damages for diminished value of land after noting the testimony of one expert that there had been no change in value of the property because the real estate market had already discounted the nuisance and because the particular nuisance did not affect the agricultural use of the property); *Reed*, 145 Cal.App.3d at 268, 193 Cal.Rptr. at 133 ("Whether Reed will be able to prove her allegation the decade-old multiple murder has a significant effect on market value we cannot determine."). They have no bearing whatsoever on standing.

Even if Plaintiffs were required to link their damages to Defendants' conduct, the district court ignored that Plaintiffs pleaded that they had suffered damages that could be differentiated from general economic conditions. Plaintiffs specifically alleged that, "[t]hrough economic expert analysis and testimony, the damages to Plaintiffs and those similarly situated as a result of Defendants' scheme are capable of being ascertained, and will be ascertained and calculated separate and apart from devaluation resulting from other economic factors such as unemployment trends and

general market fluctuations." FAC ¶ 34, ER 268-69. Although the district court was required to accept the allegations of the complaints as true, *see Wolfe,* 392 F.3d at 362, with no evidence before it, the court simply disbelieved and disregarded this allegation. Without seeing the economic analysis referred to, the district court suggested at oral argument that any such analysis would be unlikely to pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),) and determined on its own that no such analysis was possible. This, too, was error.

### D.  A Favorable Decision in This Case Will Redress Plaintiffs' Injury

There can be no doubt that a favorable decision in this case will redress Plaintiffs' injury. Indeed, the district court did not find otherwise, nor could it have.

As this Court has explained, "[t]he final standing inquiry, redressability, requires a court to determine whether it possesses the ability to remedy the harm that a petitioner asserts." *Citizens for Better Forestry*, 341 F.3d at 975-76. Here, Plaintiffs allege that they paid too much for their homes – an award of money damages will plainly redress that overpayment. Similarly, and alternatively, Plaintiffs allege that their homes have lost value as a result of Defendants' misrepresentations. Again,

this loss of value will be fully redressed by an award of money damages. Finally, it is clear that this Court has the power to award money damages to Plaintiffs should Plaintiffs prevail on their claims.

### E.  Plaintiffs' Standing Does Not Turn on Whether They Will Prevail or Can Prove Their Damages

The district court appeared to believe that Plaintiffs would be unable to prove their damages for loss of value to their homes, either because the real estate market might recover, or because Plaintiffs would not be able to differentiate the harm caused by Defendants from diminutions in value caused by general economic conditions; the court believed that, under these circumstances, Plaintiffs were not "injured" within the meaning of Article III.  But the fact that a plaintiff might turn out to be unable to prove the alleged injury, be wrong about the scope of the law's protection, or be unable to prove his damages, does not affect his standing to bring the claim in the first place, if he seeks redress for a sufficiently concrete and particularized injury.  *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ("the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case); *Bell v. Hood*, 327 U.S. 678, 682, (1946)) ("[j]urisdiction . . . is not defeated . . . by the possibility

that the averments might fail to state a cause of action on which petitioners could actually recover)"; *Farrakhan v. Gregoire*, 590 F.3d 989 (9th Cir. 2010) (same); *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006) ("The point is not that to establish standing a plaintiff must establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit. It is that he must have a colorable *claim* to such a right."); *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 909 (7th Cir. 2003) ("if his claim has no merit, then [plaintiff] he has not been injured by any wrongful conduct of the defendant; but if the consequence were that he lacked standing, then every decision in favor of a defendant would be a decision that the court lacked jurisdiction."); *Harzewski v. Guidant Corp.*, 489 F.3d 799, 803 (7th Cir. 2007) (plaintiffs have standing to sue because if they win they will obtain a tangible benefit; that a plaintiff might fail to prove he was entitled to relief is a matter of the merits, not standing).[10]

---

[10] The only limitation on this principle is where the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Steel Co.*, 523 U.S. at 89; *see also Memphis Light*, 436 U.S. at 9 (where claims "not so insubstantial or so clearly foreclosed by prior decisions," claim for damages could not be moot.)

That Plaintiffs in this case might not win does not mean they have not alleged an "injury in fact." To the extent that the district court believed otherwise, that was error.[11]

## II. PLAINTIFFS HAVE STANDING TO SEEK THE OPTION TO RESCIND THEIR PURCHASES

The district court never addressed whether Plaintiffs have standing to seek rescission of their contracts of purchase and sale. It is clear that they do.

As the Supreme Court has explained, "[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358, n. 6, (1996). "Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Federal Election Com'n*, 128 S. Ct. 2759, 2769 (2008); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2007) ("a plaintiff must demonstrate standing separately for each form of

---

[11] Although the Court believed there were defects in Plaintiffs' pleadings, the district court did not reach the issue of whether Plaintiffs stated claims on which relief could be granted, or whether they pleaded with sufficient particularity. Plaintiffs believe that their Complaints cannot and ought not be dismissed on either of those grounds. Moreover, the district court stated on the record that the court would have granted leave to amend to correct any defects in the pleadings. *See* Excerpts of Reporter's Transcript at Oral Proceedings ("Transcript") at 7:13-14, ER 247; *see also* Point III, *infra.*

relief sought"). While this principal is often cited to show that standing to bring one claim does not necessarily confer standing to bring a different one, or to seek a different form of relief, the converse is also true: the absence of standing for one claim does not preclude standing for another. Put another way, standing is not denied in gross, either. Thus, Plaintiffs' standing to seek rescission of their purchase and sale contracts must be analyzed separately from their standing to seek damages.

The district court thought that Plaintiffs lacked standing to seek damages because their losses were "unrealized" in the sense that they had not sold their homes. Although this was incorrect even as to Plaintiffs' claim for damages, it is plain that "realization" could not possibly be a prerequisite of standing in a claim for rescission, for only a purchaser still in possession may seek rescission. To suggest that a purchaser seeking rescission for fraud has failed to raise an actual "case or controversy" would be absurd.

Indeed, Plaintiffs satisfy all three of the *Lujan* factors with respect to their claim for rescission. They allege an "injury in fact" -- they were induced to purchase homes they would not have bought had Defendants not misrepresented the character of the neighborhoods in which the homes

61

are located.  This injury is "fairly traceable" to Defendants, because Defendants made the misrepresentations and sold them their homes.  And the injury would be redressed by the relief Plaintiffs are seeking – Plaintiffs would get their money back and the transactions they were fraudulently induced to enter into would be unwound.  Plaintiffs have standing to seek this relief.

## III.   THE DISTRICT COURT ERRED IN DENYING LEAVE TO REPLEAD

Although Plaintiffs requested leave to replead, the district court dismissed Plaintiffs' complaints with prejudice and denied leave to amend. If this Court does not agree that Plaintiffs have standing to assert the claims set forth in the First Amended Complaint, the Court should reverse the district court's denial of leave to replead and give the Plaintiffs the opportunity to amend their complaints.[12]

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.Pro. 15.  Only when an amendment would be futile or cause undue prejudice to the defendant, or is asserted in bad faith, does a district court act within its discretion to deny leave to amend.

---

[12] This Court reviews the district court's denial of leave to amend for abuse of discretion. *See Eminence Capital, LLC. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

*Chappel v. Laboratory Corp. of America*, 232 F.3d 719, 725-26 (9th Cir. 2000). As this Court held in *Harris v. Amgen*, Inc., 573 F.3d 728, 736 (9th Cir. 2009), "Dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment."

Here, amendment would not have been futile. The district court held that Plaintiffs' injury was not "fairly traceable" to Defendants' fraud because Plaintiffs' loss arose from numerous additional, independent factors relating to general economic conditions. *See* Opinion at 24, ER 24. At oral argument, Plaintiffs' counsel offered to provide the Court, and to plead, specific evidence that the injury from Defendants' fraud could, in fact, be separated from any injury resulting from general economic conditions:

> The issue, though, as we see it, as I see it, is without any discovery, without any expert testimony, we've gone to a position that as a matter of law the injuries that we are alleging are so interwoven with economic conditions that plaintiff cannot meet its standing requirement. And when I amended this complaint, before alleging that an expert would be able to distinguish the differences, I hired an expert to do that. And we did that in the *Dodaro versus Standard Pacific* case. *And I want to go through the methodology so I can request of the Court that we have leave to amend to be able to attach that report and allege specifically what that expert and the expert testimony will be able to do,* because I don't think that as a matter of law that we're in a position where we can say this is

> so intertwined with the other economic conditions that plaintiff
> cannot meet their burden of showing an inflated price.

Transcript at 9:20-10:2, ER 248-49 (emphasis added). Counsel continued, offering to "lay out through admissible evidence from an expert they can separate economic conditions from subprime lending at an inflated price, and once you've paid an inflated price, it never goes away. Whether the house goes up or down doesn't make any difference, you've paid an inflated price." *Id.* at 16:25-17:5, ER 254-55.

Despite this proffer, the district court, in denying leave to replead, wrote that "the Court finds that Plaintiffs would be unable to amend their pleadings to correct the deficiencies related to constitutional standing." Opinion at 30, ER 30. The court made no reference to Plaintiffs' proffer and did not explain *why* Plaintiffs' proposed amendment would not cure the defects the court believed were present in Plaintiffs' complaints, although, at argument, the court expressed skepticism that the expert Plaintiffs' counsel described "would pass a *Daubert* standard," *see* Transcript at 12:5-6, ER 251, a plainly improper consideration at the pleading stage.

At the argument, moreover, the district court stated on the record "I would have granted leave to amend as to the Rule 9(b) and the 12(b)(6) failure to state a claim." Transcript at 7:13-14, ER 247. It should have done

so despite grounding its dismissal in Rule 12(b)(1). This Court should correct the error and grant Plaintiffs the opportunity to plead specific facts showing that the injury to Plaintiffs is fairly traceable to the Defendants' conduct and not to general economic conditions.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's dismissal of Plaintiffs' claims for lack of standing.

Dated:  October 5, 2010

Respectfully submitted,

  /s/  Andrea Bierstein
Andrea Bierstein
abierstein@hanlyconroy.com
HANLY CONROY BIERSTEIN SHERIDAN FISHER &
HAYES LLP
112 Madison Avenue, 7th Floor
New York, New York 10016
Phone:  (212) 784-6403
Fax:  (212) 213-5949

Richard D. McCune
rdm@mccunewright.com
David C. Wright
dcw@mccunewright.com
Jae (Eddie) K. Kim
jkk@mccunewright.com

65

McCuneWright LLP
2068 Orange Tree Lane, Suite 216
Redlands, California  92374
Phone: (909) 557-1250
Fax: (909) 557-1275

Derek Y. Brandt
dbrandt@simmonsfirm.com
Simmons Browder Gianaris
Angelides & Barnerd LLC
707 Berkshire Boulevard
East Alton, Illinois 62024
Phone: (618) 259-2222
Fax: (618) 259-2251

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 13,891 words excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii), as counted by the word-counting feature of Microsoft Word 2007.

/s/ Andrea Bierstein
Andrea Bierstein

# CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by Express Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery to the following non-CM/ECF participants:

SEE ATTACHED LIST

s/ Natasha S. Johnson
    Natasha S. Johnson

Jason Charles Gless
Daniel Adlai Berman
Keith Evan Smith
Wood, Smith, Henning & Berman
3801 University Avenue , Suite 710
Riverside, CA 92501

 *Counsel for Richmond American Defendants*

Nathaniel Garrett
Craig Stewart
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104

*Counsel for Lennar Defendants*

Lawrence J. Bracken, II
Bryan A. Powell
HUNTON & WILLIAMS
NationsBank Plaza
600 Peachtree Street N.E.
Atlanta, GA 30308-2216

Phillip J. Eskenazi
HUNTON & WILLIAMS LLP
550 S. Hope Street, Suite 2000
Los Angeles, CA 90071-2627

Kirk Hornbeck
HELLER EHRMAN LLP
333 South Hope Street, 39th Floor
Los Angeles, CA 90071

*Counsel for Beazer Defendants*