**Nos. 10-55658, 10-55660, 10-55662, 10-55663,
10-55664, 10-55665, 10-55667, 10-55668**

# United States Court of Appeals
## for the
# Ninth Circuit

◆❙◆

SYLVESTER MAYA; OFER MASACHI, as Individuals and on behalf of all others
similarly situated,

*Plaintiffs-Appellants,*

– v. –

CENTEX CORPORATION; CENTEX HOMES, a Nevada General Partnership;
CTX MORTGAGE COMPANY,

*Defendants-Appellees.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

Derek Brandt
SIMMONS BROWDER GIANARIS
  ANGELIS & BARNERD LLC
707 Berkshire Boulevard
East Alton, Illinois 62024
(618) 259-6357

Andrea Bierstein
HANLY CONROY BIERSTEIN SHERIDAN
  FISHER & HAYES LLP
112 Madison Avenue
New York, New York 10016
(212) 784-6400

Richard D. McCune
Jae Eddie K. Kim
David Wright
MCCUNE WRIGHT, LLP
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
(909) 557-1250

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ...................................................................... iv

ARGUMENT ............................................................................................ 1

I.    PLAINTIFFS HAVE STANDING TO SEEK DAMAGES ............................. 1

    A.    Plaintiffs Adequately Allege Injury-in-Fact ........................ 2

        1.    *Plaintiffs' Injuries Are Neither Temporary nor Speculative* .................................................................. 3

        2.    *Physical Changes to a Property or a Neighborhood Are Not Necessary to Confer Standing* ........................................................................ 8

        3.    *There Is No Risk of Double Recovery* ........................ 9

        4.    *Principles of Injury Applicable to Securities Are Not Applicable Here* .................................................. 10

        5.    *Plaintiffs Paid Fraudulent Prices, Not "Free Market" Prices* ........................................................ 11

        6.    *Plaintiffs Have Standing to Sue for the Reduced Desirability of Their Homes* ...................................... 13

    B.    Plaintiffs Adequately Plead a Harm "Fairly Traceable" to Defendants' Conduct ...................................................... 14

II.   PLAINTIFFS HAVE STANDING TO SEEK RESCISSION ......................... 21

III.  NO "ALTERNATIVE GROUNDS" WARRANT DISMISSAL OF PLAINTIFFS' CLAIMS ...................................................................... 22

    A.    This Court Need Not and Should Not Consider the "Alternative Grounds" Urged by Defendants ................. 22

    B.    Plaintiffs' Claims Should Not Be Dismissed Under Rule 12(b)(6) ...................................................................... 24

        1.    *The Complaints State Claims for Fraud and Negligent Misrepresentation* ...................................... 25

(a)   Plaintiffs State Claims for Fraudulent and Negligent Omissions..........................................26

      *(1)   California Law Creates a Duty to Disclose Material Facts Affecting the Value or Desirability of Real Property*......................................................26

      *(2)   Defendants Had a Duty to Disclose the Presence of High Foreclosure Risk Buyers In Order to Make Their Voluntary Representations Not Misleading*.................................................31

      *(3)   The Disclosure at Issue Is Neither Impractical Nor Impossible Nor Illegal*........................................................32

(b)   Plaintiffs Allege Actionable Affirmative Misrepresentations..............................................36

*2.   The Complaints State Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing* ..........................................................42

*3.   Plaintiffs Have Properly Pleaded Their Statutory Claims*.............................................................44

*4.   The Claims of the Lumalu Plaintiffs Should Not Be Dimissed* .................................................48

    (a)   Plaintiffs' Claims Do Not Depend on Whether They Financed Their Homes Through Defendants' Mortgage Company Subsidiary ..........................................................48

    (b)   Richmond's Vague and General Disclaimers Do Not Shield It From Liability .............................................................50

C.   Plaintiffs Have Pleaded Their Fraud Claims with Sufficient Particularity...........................................53

IV.   IF ANY PART OF PLAINTIFFS' CLAIMS IS DISMISSED, PLAINTIFFS SHOULD BE GRANTED LEAVE TO RE-PLEAD..................56

CONCLUSION ........................................................................................................58

CERTIFICATE REGARDING COMPLIANCE................................................................60

# TABLE OF AUTHORITIES

*Page*

## Cases

*Alexander v. McKnight,* 7 Cal. App. 4th 973, 9 Cal. Rptr. 2d 453 (1992) ............................................................................ 27, 28

*Alschuler v. Dep't of Housing & Urban Dev.,* 686 F.2d 472 (7th Cir. 1982).............................................................................8

*Appling v. State Farm Mut. Auto. Ins. Co.,* 340 F.3d 769 (9th Cir. 2003)..............................................................................44

*Assilzadeh v. California Federal Bank,* 82 Cal.App.4th 399, 98 Cal.Rptr.2d 176 (2d Dist. 2000) ........................................41

*Barnes v. Yahoo!, Inc.,* 570 F.3d 1096 (9th Cir. 2009)................................. 24, 35

*Bartleson v. U.S.,* 96 F.3d 1270 (9th Cir. 1996)............................................. 28, 32

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955 (2007) ..................24

*Bennett v. Spear,* 520 U.S. 154 (1997).................................................................21

*Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 834 P.2d 745 (1992)....................40

*California Lettuce Growers v. Union Sugar, Co.,* 45 Cal.2d 474, 289 P.2d 785 (1955) ......................................................................43

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal. 4th 163, 83 Cal. Rptr. 2d 548, 561 (1999)............................ 45, 46

*Continental Airlines, Inc. v. McDonnell Douglas Corp.,* 216 Cal.App.3d 388, 264 Cal.Rptr. 779 (2d Dist. 1989)........................................38

*Davis v. Ford Motor Credit Co.,* 179 Cal. App. 4th 581, 101 Cal. Rptr. 3d 697 (2009)..................................................................................46

*Davis v. Monte,* 81 Cal. App. 164, 253 P. 352 (1927) ........................................41

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59 (1978) ..............................................................................20

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) .................... 10, 11

*Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000)................................................................................23

*Falk v. General Motors Corporation*, 496 F. Supp. 2d 1088 (N.D. Cal. 2007)................................................................................54

*Flores v. Emerich & Fike*, 2008 WL 2489900 (E.D. Cal. June 18, 2008) .........24

*Freeman v. Time Inc.*, 68 F.3d 285 (9th Cir. 1995) ..............................................51

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) ......................................................................20

*Furla v. Jon Douglas Co.*, 65 Cal. App. 4th 1069, 76 Cal. Rptr. 2d 911 (1998) ................................................................................41

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979)...... 8, 18, 19, 20

*Green v. Beazer Homes Corp.*, 2007 WL 2688612 (D.S.C. Sept. 10, 2007)................................................................................. 3, 5, 6

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................ 8, 19, 20

*Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 159 P.2d 958 (1945) ...................39

*Hoey v. Sony Electronics Inc.*, 515 F.Supp.2d 1099 (N.D. Cal. 2007)............31

*In re Dura Pharmaceuticals, Inc. Securities Litigation*, 2001 WL 35925887 (S.D. Cal. Nov. 2, 2001) ...................................................10

*In re Evans*, 181 B.R. 508, 512 (Bkrtcy. S.D. Cal. 1995)....................................39

*In re Smith*, 1999 WL 33582223 (Bkrtcy. C.D. Ill. 1999) ...................................34

*Kaing v. Pulte Homes*, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010).......... 4, 5, 6

*Kirby v. Dep't of Housing & Urban Dev.*, 675 F.2d 60 (3d Cir. 1982) ............8

*Lazar v. Superior Court*, 12 Cal. 4th 631, 909 P.2d 981 (1996) .......................25

*Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580 (9th Cir. 2008)..........................24

*Limandri v. Judkins*, 52 Cal. App. 4th 326, 60 Cal. Rptr. 2d 539 (1997) ........26

*Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115, 61 Cal.Rptr.3d 221(6th Dist. 2007)............................................................31

*Lingsch v. Savage*, 213 Cal. App. 2d 729, 735, 29 Cal. Rptr. 201 (1963) ........26

*McKeever v. Locke-Paddon Co.*, 58 Cal. App. 51,  207 P. 1040 (1922) ..........40

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002) ............................25

*Mondragon v. Meritage Homes of California, Inc.*, 2010 WL 1972284 (Cal. App. 3rd Dist. May 18, 2010)............................................................ 28, 33

*Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir. 1989) .........54

*Munoz v. PHH Corp.*, 659 F. Supp. 2d 1094 (E.D. Cal. 2009) .........................34

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) ...................................53

*Pacesetter Homes, Inc. v. Brodkin*, 5 Cal.App.3d 206, 85 Cal.Rptr. 39 (2d Dist. 1970) ......................................................................... 39, 40, 41

*Padgett v. Phariss*, 54 Cal.App.4th 1270, 63 Cal.Rptr.2d 373 (4th Dist. 1997)........................................................................................................41

*Perdue v. Crocker*, 38 Cal. 3d 913, 216 Cal.Rptr. 345 (1985) ..........................43

*Perez v. State Farm Mut. Auto Ins. Co.*, 319 Fed.Appx. 615 (9th Cir. Mar. 17, 2009) ....................................................................................12

*Randi W. v. Muroc Joint Unified School Dist.*, 14 Cal.4th 1066, 929 P.2d 582 (1997) ....................................................................................31

*Reed v. King, 145 Cal. App. 3d 261, 193 Cal. Rptr. 130 (1983)* .... 27, 29, 30, 31

*Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir. 2002) ...........................16

*Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918 (7th Cir. 1995) .........11

*Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 93 Cal. Rptr. 2d 439 (2000) ...................................................................................................45

*Shapiro v. Sutherland*, 64 Cal.App.4th 1534 (1998) .........................................28

*Shin v. BMW of North America*, 2009 WL 2163509 (C.D. Cal. July 16, 2009)........................................................................................................51

*Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976). ...........16

*Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931 (N.D. Cal.
June 5, 2009) ...........................................................................37

*Sweat v. Hollister*, 37 Cal. App. 4th 603, 608 Cal. Rptr. 2d 399 (1995) ..........26

*Tellabs, Inc. v. Makor Issues and Rights Ltd.*, 551 U.S. 308, 127 S. Ct.
2499 (2007) ............................................................................24

*Tingley v. Beazer Homes Corp.*, 2008 WL 1902108 (W.D.N.C. Apr.
25, 2008) ........................................................................ 3, 5, 6

*Title Guarantee & Trust Co. v. Stahler*, 15 Cal.App.2d 239, 59 P.2d
515 (3d Dist. 1936) ..................................................................41

*United States ex rel. Lee v. Smith Kline Beecham, Inc.*, 245 F.3d 1048
(9th Cir. 2001)........................................................................54

*Universal Sales Corp. v. Cal. Etc. Mfg. Co.*, 20 Cal.2d 751, 128 P.2d
665 (1942) ............................................................................42

*Vah Dah Dunshee v. Boadway*, 119 Cal.App. 678, 7 P.2d 325 (3d
Dist. 1932) ...........................................................................39

*Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097 (9th Cir. 2003) ................................48

*Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008) ......... 50, 51, 52

*Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 68 Cal.Rptr.3d 746
(2007) ................................................................................44

*Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004) .............................................8

*Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987)...................54

## Statutes, Rules, & Regulations

Cal. Bus. & Prof. Code § 17200 .................................................... 44, 45

Cal. Bus. & Prof. Code § 17500 ........................................................44

Cal. Civ. Code § 1102.1 ..............................................................47

Cal. Civ. Code § 1102.7 ..............................................................47

Cal. Civ. Code § 2079 ............................................................................28

Cal. Civ. Code § 3343 ............................................................................13

Cal. Stats.1994, c. 339 § 3 (S.B.1509) ..................................................28

Fed.R.Civ.P. 15(a) ................................................................................57

Fed.R.Civ.P. 8........................................................................................48

Fed.R.Civ.P. 9(b) ..........................................................................passim

## Other Authorities

66 Fed. Reg. 65604-01 (2001) ...............................................................47

# ARGUMENT[1]

## I.    PLAINTIFFS HAVE STANDING TO SEEK DAMAGES

Defendants challenge Plaintiffs' Article III standing to assert their claims due to a claimed lack of injury-in-fact and a lack of causal connection between such injury and Defendants' conduct.[2]  Defendants address their arguments to an imaginary case of their own making, rather than to the claims Plaintiffs actually have asserted.  Plaintiffs do not allege that Defendants caused a global recession or a housing bubble, and do not seek recovery on the basis of such generalized, societal injuries.  Rather, Plaintiffs allege that Defendants defrauded them in the purchase of their

---

[1] Plaintiffs here reply to three separate briefs from the Defendants-Appellees:  (1) a Joint Brief submitted by the Defendants-Appellees in the *Maya, Martinez, Kelly, Stephens, Dodaro,* and *Nielsen* cases; (2) a brief submitted by the Defendants-Appellees ("Richmond") in the *Lumalu* case; and (3) a brief submitted by the Defendants-Appellees ("Ryland") in the *Oneto* case.  In this reply, the Joint Brief is cited as "JB"; the brief submitted by Richmond is cited as "RAB" and the brief submitted by Ryland is cited as "Ry.B."  Plaintiffs further note that the Joint Brief purports to adopt and incorporate by reference the arguments in Richmond's brief, *see* JB at 4 n.1; Richmond's brief purports to incorporate by reference the arguments in the Joint Brief, *see* RAB at 1; and Ryland's brief purports to incorporate by reference all the arguments in the Joint Brief and in Richmond's Brief, *see* Ry.B at 11 n.4.

[2] Defendants do not dispute the third element of Constitutional standing, that Plaintiffs' injury will be redressed by a favorable decision here. *See* Appellants' Principal Brief ("Pr. Br.") at 57-58.

homes – an injury that is both concrete and direct, because Plaintiffs actually purchased their homes from the Defendants from whom they now seek redress. Moreover, the conduct at issue here, which gave rise to Plaintiffs' injuries, is not Defendants' lending practices themselves, but Defendants' material misrepresentations and omissions to Plaintiffs *about* those lending practices.

Plaintiffs' claims, properly cast, do not seek to turn Defendants into "insurers against global recessions," JB at 1, or "insurers against economic downturns," JB at 33. Plaintiffs seek to hold Defendants as insurers only against their own fraud in connection with the sale of homes to Plaintiffs. Under Article III of the Constitution, it is clear that Plaintiffs have standing to pursue that claim.

A.    **Plaintiffs Adequately Allege Injury-in-Fact**

Defendants claim that Plaintiffs have suffered no injury-in-fact because they have not yet sold their homes. But this argument completely misapprehends the nature of the injuries that Plaintiffs have suffered. Plaintiffs suffered an injury from over-paying for their homes at the time they bought them; they have also suffered the injury of the reduced value and desirability of those homes since Defendants' fraud was revealed.

Plaintiffs thus already have suffered injuries that are concrete and permanent.

>  1.    *Plaintiffs' Injuries Are Neither Temporary nor Speculative*

Plaintiffs' injury is not "temporary," as Defendants would have it. Plaintiffs were injured when they unknowingly bought homes in unstable, fragile neighborhoods, while paying prices for the stable, traditional neighborhoods they were promised.  Housing prices may go up at some point, or may go down, but the neighborhoods in which Plaintiffs live will not have been the stable, traditional neighborhoods that Plaintiffs were promised.  Indeed, the degree of sensitivity of those neighborhoods to the vicissitudes of the economy has been enhanced by the character of the homeowners in the neighborhoods.  A neighborhood with fewer high foreclosure risk homeowners suffers less in a recession and is less subject to fluctuations in a bubble.  The reduced desirability of their homes is also an injury that Plaintiffs suffer now; it is compensable regardless of whether the homes ever become more desirable at some time in the future.

Defendants rely primarily on a trio of district court cases, *Green v. Beazer Homes Corp.*, 2007 WL 2688612 (D.S.C. Sept. 10, 2007), *Tingley v. Beazer Homes Corp.*, 2008 WL 1902108 (W.D.N.C. Apr. 25, 2008), and

*Kaing v. Pulte Homes*, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010),[3] for their argument that Plaintiffs' injury is temporary because they have not resold their homes. The *Green*, *Tingley*, and *Kaing* courts all used the same analysis followed by the court below; indeed, the district court in this case cited and followed that trio of cases in error. None of these cases is authoritative in this Court and all three were erroneously decided for the reasons set forth in Plaintiffs' Principal Brief. All of these cases treated the injury of the plaintiffs before them as a monetary loss measured by the difference between the price at which plaintiffs bought and the price at which they sold; such an injury could not be measured before the resale and might be temporary if the market recovered.

But, as explained in Appellants' Principal Brief, Plaintiffs are not suing for a future reduced profit on the resale of their homes – they are suing for (a) the difference between the price they paid and the value of their homes *at the time of purchase* in light of the true facts about the neighborhoods in which the homes were located; and (b) the reduced value

---

[3] As this Court is aware, *Kaing* is also on appeal before this Court.

and desirability of their homes since the revelation of the truth about those neighborhoods. Those are injuries they already have suffered.

*Tingley*, *Green*, and *Kaing* are also factually distinguishable from the claims here. Most significantly, in *Tingley* and in *Green*, it does not appear that plaintiffs' claims were based on misrepresentations and omissions made to them in the sales process. Rather, those plaintiffs alleged merely that the defendants' sales and lending practices had led to widespread foreclosures, *see Tingley*, 2008 WL 1902108, *1; *Green*, 2007 WL 2688612, *1; indeed, the class that the *Tingley* plaintiff sought to represent consisted of "North Carolina residents who purchased homes in subdivisions in North Carolina containing homes constructed by [the defendants] where the foreclosure rate for the subdivision is significantly higher than the statewide average." 2008 WL 1902108, *1. This definition included buyers who did not even purchase from the defendants, and thus underscores that, unlike the claims in this case, the claims in *Tingley* and in *Green* were not based on a fraud perpetrated against the plaintiffs and others like them in the actual purchase and sale process.

The facts of *Kaing* also differ substantially from the facts here. In *Kaing*, the plaintiff alleged that *she* was an unqualified buyer and that the

5

defendant should not have sold to her.  2010 WL 625365, *2.  Obviously, the *Kaing* plaintiff could not claim that defendants concealed from her that it was selling to unqualified buyers, which is at the heart of Plaintiffs' case in the instant actions.  Further, the plaintiff in *Kaing* did not claim she paid an inflated price.  On the contrary, the facts in her complaint, as set forth in the district court's opinion, showed that, although defendants originally offered the house for sale at an inflated price, plaintiff did not pay that price and, in fact, paid approximately the price she alleged the house was worth.  *Id.* at *4.  Even if *Tingley*, *Green,* and *Kaing* had been correctly decided, they would provide no basis for this Court to conclude that Plaintiffs now before this Court lack standing to sue for fraud in the purchase of their homes.[4]

Nor is Plaintiffs' injury speculative, as Ryland would have it.  *See* Ry.B. at 32-35.  Plaintiffs do not allege that they over-paid for their homes

---

[4] Defendants also cite *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 924 (7th Cir. 1995), in support of their argument that Plaintiffs' injury is temporary, see  JB at 32,  but *Sanner* is a traceability case, not a case which defines or limits "injury-in-fact."  62 F.3d at 930. In fact, in light of the extensive discussion of causation and traceability, it might better be said that the *Sanner* court actually assumed that even non-selling plaintiffs had suffered an "injury-in-fact." *See id* at 923-24, 930.

simply because Defendants were manipulating the market. Rather, Plaintiffs allege that they over-paid for their homes because Defendants misrepresented what they were selling. Had Defendants told the truth about the character of the neighborhoods they were building, Plaintiffs would not have been willing to pay the prices they paid. Whatever the market price for a home in a stable, traditional neighborhood, the market price for the same home in a neighborhood of known high foreclosure risk buyers was less. Plaintiffs paid too much because they paid for something they were told they were getting, but weren't. *See,* e.g., *Oneto* FAC ¶ 69, ER 538.[5]

Similarly, Defendants' assertion that "it is unclear that the value of plaintiffs' homes was any less than they paid," *see* Ry.B. at 33-34; *see also* JB at 7, should be rejected. Plaintiffs have alleged that their homes were worth less than they paid, and have alleged facts – including the concealed presence of high foreclosure risk buyers in the neighborhood – that support

_____

[5] Ryland also continues to argue that *Phillips v. Frank*, 295 F.2d 629 (9th Cir. 1961) requires a re-sale before an injury becomes cognizable. Ry.B. at 18 and n.6. But *Phillips* is not a standing case and, if it were, it would no longer be good law under the later cases in the Supreme Court and this Court that do address standing and that do not require a re-sale. *See* Pr. Br. at 36-40.

that allegation.  No more is required.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (on a facial challenge to standing, the court must "take the allegations in the plaintiff's complaint as true.").

### 2.     *Physical Changes to a Property or a Neighborhood Are Not Necessary to Confer Standing*

Defendants attempt to distinguish the wealth of authority cited by Plaintiffs in their Principal Brief by claiming that only physical changes to property or the adjoining area are cognizable, but Defendants' characterization of Article III precedent does not stand up. In *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 (1979) and *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376 (1982), a diminution in property value due to racial steering was sufficient to confer standing.  This cannot fairly be characterized as tangible, permanent, or physical.  There is nothing particularly permanent about the racial makeup of a community or about the unlawful steering practices which might drive it.

Nor are Defendants correct in their characterizations of the injuries in *Kirby v. Dep't of Housing & Urban Dev.*, 675 F.2d 60, 62 (3d Cir. 1982), and *Alschuler v. Dep't of Housing & Urban Dev.*, 686 F.2d 472, 476-77 (7th Cir. 1982), as injuries "without possible correction through market" or which "could not be remedied through market recovery." JB at 34.  Indeed,

Defendants' frequent refrain that property values are subject to many market forces and that any loss is as "temporary" as the prevailing market suggests that reduced values – no matter the reason – eventually will be erased by increasing property values generally. Even the plaintiff who is defrauded because his home is built on fill could reasonably expect that over some period of time the value of his property itself would appreciate through a general rise in property values; Defendants acknowledge that such a defrauded buyer has standing to sue.

### 3.    *There Is No Risk of Double Recovery*

Nor do Plaintiffs' claims give rise to any potential "double recovery" because Plaintiffs do not seek recovery from Defendants for general market losses. Rather, Plaintiffs seek from Defendants only the amount by which Plaintiffs overpaid for their homes in light of Defendants' misrepresentations and/or the amount of lost value in the properties attributable to Defendants' fraud. These are injuries and losses over and above whatever general market loss Plaintiffs have sustained. Thus, even a full market recovery will not compensate Plaintiffs for the injuries at issue here. If Plaintiffs recover for their injuries attributable to Defendants' conduct, they still will be left merely in the same position as other home-

buyers who were not the victims of Defendants' fraud, who may see increases or decreases in their home values attributable to market fluctuations. Because Plaintiffs' market losses are segregable from losses attributable to Defendants' fraud, *see* FAC § 34, ER 11-12, there is no risk of a double recovery. Nor, if there were, is the possibility of double recovery relevant to a plaintiff's *standing* and Defendants cite no authority to suggest that it is.

        4.    *Principles of Injury Applicable to Securities Are Not Applicable Here*

Defendants argue that, under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), an injury suffered as a result of being overcharged is not cognizable without a resale. But *Dura* is not a standing or an Article III case. *Dura* dealt with the defendant's challenge, under Rule 12(b)(6), based on the requirement of pleading and proving "loss causation" in the securities fraud context. *Id. See also In re Dura Pharmaceuticals, Inc. Securities Litigation*, 2001 WL 35925887, *2-3 (S.D. Cal. Nov. 2, 2001).

To the extent Defendants find appealing the "logic" that a securities purchaser, no matter what inflated price she may pay for that security, could "at that instant" turn around and sell the security at the same market price, such an argument plainly has no application here. Unlike homes,

uniquely built to varying specifications and in static locations, securities are utterly fungible, bought and sold on an efficient market. It is a complete *non sequitur* to suggest that because the purchaser of a particular security might immediately be able to turn around and sell the instrument at the same price, so too could the purchaser (and inhabitant) of a given home on a given tract of land. Indeed, the Supreme Court expressly recognized that securities "are normally purchased with an eye toward a later sale." *Dura*, 544 U.S. at 342. The same principle distinguishes *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, also cited by Defendants. To the extent that *Sanner* suggests that the owner of a fungible commodity must lock in its loss through sale in order to assert its claim, this makes for a particularly inapt comparison with Plaintiffs, who, rather than what Defendants must imagine to be some sort of real property day-traders, are homeowners who purchased their homes in order to live in them, and not in order to sell them like financial instruments.

### 5. Plaintiffs Paid Fraudulent Prices, Not "Free Market" Prices

Defendants also claim that Plaintiffs cannot have been injured because they paid "free market" prices. *See* JB at 37-38. But Plaintiffs allege that the prices they paid were tainted by fraud, and that neither they

11

nor the "market" would have paid those prices had Defendants told the truth about what they were selling.

*Perez v. State Farm Mut. Auto Ins. Co.*, 319 Fed.Appx. 615 (9th Cir. Mar. 17, 2009), is on point. In *Perez*, this Court recognized that overcharges in insurance premiums were a "concrete, particularized, and actual injury-in-fact" because they did not hinge on any future action. Defendants argue that *Perez* is distinguishable because the plaintiff there alleged that she paid "anti-competitive" prices, which Defendants recast as "prices that a reasonable person in a free market would not pay." *See* JB at 38. They claim that, in this case, unlike in *Perez*, Plaintiffs paid market prices. But the prices that Plaintiffs paid for their homes had been manipulated just as much as the prices in *Perez* -- not by anti-competitive behavior, but by fraud. A "reasonable person in a free market" would not have paid what Plaintiffs paid *if she knew the truth about the property she was buying*.[6] For the same reason, and contrary to Defendants' claim, *see* JB at 38-39,

---

[6]    Discussions of a "fragmented" real estate market and of the limited impact Defendants' conduct might have on the market overall, *see, e.g.*, JB at 25 and n.3, miss the point:  both the conduct and the injuries complained of are confined to neighborhoods or communities that Defendants – purveyors of "common interest developments" (JB at 51) – planned and built and sold in their entirety.

California law does not require the Court to assume that a reasonable person who knew the truth would have paid what Plaintiffs paid in the face of Defendants' misrepresentations and omissions. *See* Cal. Civ. Code § 3343 (damages for fraud in the purchase or sale of property computed as "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction").

### 6. *Plaintiffs Have Standing to Sue for the Reduced Desirability of Their Homes*

Both the Joint Brief and the Ryland Brief argue that Plaintiffs may not rely on the reduced desirability of their homes as places to live because, they claim, Plaintiffs have not pleaded that injury. *See* JB at 35-36; Ry.B. at 27-28. That is not so. Plaintiffs specifically identified the blight caused by high volumes of short sales and foreclosures: "abandoned houses; multiple families living in one home; transient neighbors with no long-term ties to the neighborhood; unfinished and unkempt yards; and, in some cases, increased crime." *Oneto* FAC ¶ 29, ER 527. Plaintiffs also pleaded that their neighborhoods had, in fact, been afflicted with high volumes of foreclosures and short sales, *Oneto* FAC ¶¶ 37-39, ER 529-30, and specifically alleged that the disclosures that Defendants omitted "were

material to Plaintiffs and all class members in that they related both to the value of their houses *and the desirability of the properties*." *Oneto* FAC ¶ 50, ER 532 (emphasis added). They further alleged that "The *desirability* of Plaintiffs' properties and the . . . neighborhoods has been drastically altered and reduced as a direct result of the foreclosures, short sales, and investor-owned properties." *Id.* at ¶ 51, ER 532.

Just as Defendants erroneously claim that reduced market value must be caused by physical changes in order to confer standing, Ryland similarly claims that reduced desirability must be caused by physical changes to constitute injury-in-fact. *See* Ry.B. at 29-32. But, as noted above, the cases cited by Plaintiffs in their Principal Brief refute that argument.

### B. Plaintiffs Adequately Plead a Harm "Fairly Traceable" to Defendants' Conduct

Defendants claim that Plaintiffs' harm is not "fairly traceable" to Defendants' conduct, but miss the fundamental point: the causal chain is not attenuated here, because *Plaintiffs bought their homes directly from the Defendants, who defrauded them by misrepresenting the character of what was being sold*. Ignoring the parties' direct dealings, Defendants' argument proceeds as if Plaintiffs were simply homeowners who never dealt with Defendants, but who have seen the value of their homes reduced

14

by the recession and claim that the general reduction in housing prices was caused by Defendants' fraudulent manipulation of the housing market. In that circumstance, it may well be that the causal chain between declining real estate values and the Defendants' other conduct would be too attenuated to create standing. But that is not this case and Plaintiffs have never suggested that Defendants are liable for a general decline in housing prices. The injury for which Plaintiffs seek redress is that they were defrauded by *these Defendants* into purchasing homes in neighborhoods of substantially different character than they were led to believe. The causal chain between Defendants' conduct and Plaintiffs' purchases is direct and unbroken: but for Defendants' misrepresentations made directly to them, Plaintiffs would not have purchased their homes from these same Defendants.

Defendants devote many pages to cases where the causal chain between plaintiffs' injury and defendants' conduct was "too attenuated," but the intensely factual nature of these cases, and of the particular causal chains at issue, makes them inapplicable here. Moreover, the cases cited in the Joint Brief almost uniformly involve governmental action of general applicability; these cases have nothing to do with a plaintiff's standing to

15

seek redress from a private individual or entity with whom the plaintiff has personally dealt.[7]

To the extent that Defendants focus on an analytic principle that can be applied to this case, they recognize that a causal chain is too attenuated if "speculative inferences are necessary to connect [plaintiffs'] injury to the challenged actions" of defendants, rather than the actions of third parties. JB at 16-17, *citing Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Applying that principle here, it is clear that no speculation is required to tie Plaintiffs' injury to Defendants' actions, as opposed to anyone else's: Plaintiffs bought their homes directly from Defendants and Defendants made their misrepresentations directly to Plaintiffs.

---

[7] The sole case cited in the Joint Brief on the traceability point that is *not* a government action case is *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir. 2002). But in *Rivera*, the Fifth Circuit found a lack of Article III standing because the plaintiffs had not demonstrated injury-in-fact. *Rivera*, 283 F.3d at 319-21. Deeming defendants the cause of injury to plaintiffs thus would have been "absurd,'" JB at 17, only because the plaintiffs were attempting to connect the defendant's alleged failure to warn to an injury the plaintiffs did not even suffer. *Rivera*, 283 F.3d at 321. *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000), cited by Ryland, also involves a private defendant, but not one with whom plaintiffs had personally dealt.

Defendants invent elaborate causal chains with numerous intermediate steps that they claim break the connection between their conduct and Plaintiffs' injury, but Defendants mischaracterize both the alleged wrongful conduct and the alleged injury; it is hardly surprising that the causal chain they construct has little to do with alleged facts of this case. Defendants offer supposed causal chains that begin with Defendants' lending practices, but those lending practices are not the wrongful conduct at issue. Plaintiffs allege that they were defrauded: it is Defendants' misrepresentations *about* those lending practices that begin the causal chain. Nor do Defendants correctly state the injury when they argue that Plaintiffs "seek to hold defendants, and defendants alone, liable for losses they sustained as a result of the many forces that triggered the recent global economic downturn and ensuing decrease in property values." JB at 15. Rather, Plaintiffs seek to hold Defendants liable for the difference between what Defendants represented they were selling and what they were actually selling.

When the beginning and end points of the causal chain are correctly identified, it is clear that Plaintiffs' injury is "fairly traceable" to Defendants' conduct: Defendants misrepresented the nature of the

17

neighborhoods in which the homes they were selling were located; Plaintiffs relied on those misrepresentations and purchased homes they would not have purchased or paid prices they would not have paid, had they known the truth; the precise risks that Defendants concealed – high foreclosure risk purchasers who could not weather any changes in the economy – came to pass, and Plaintiffs have suffered the harms of (a) overpaying for their homes and (b) living in neighborhoods less desirable than they were promised.

Defendants also overlook that essentially all of the intermediate factors they claim break the causal chain between their fraudulent conduct and Plaintiffs' injury were present in the cases cited in Plaintiffs' Principal Brief, and yet those factors did not impede standing in those cases.  In *Gladstone*, 441 U.S. 91, for example, the municipality sued real estate companies for racial steering alleging that it had "been injured by having [its] housing market … wrongfully and illegally manipulated to the economic and social detriment of the citizens of [the] village."  *Id.* at 95. Not only was this a sufficient allegation of injury to confer Article III standing, but the Supreme Court further explained:

> The adverse consequences attendant upon a "changing" neighborhood can be profound. If petitioners' steering practices

18

significantly reduce the total number of buyers in the Bellwood housing market, prices may be deflected downward. This phenomenon would be exacerbated if perceptible increases in the minority population directly attributable to racial steering precipitate an exodus of white residents. … A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services. Other harms flowing from the realities of a racially segregated community are not unlikely.

*Id.* at 110-11.  It apparently did not trouble the Supreme Court that such a causal chain incorporated, among other things, numerous steps by third parties, the *possible* downward deflection of housing market prices (which could be impacted by any number of factors, as Defendants here argue), the subjective perceptions of unnamed and unknowable individuals, and the capacity and desire of white residents to flee, all in order that the municipality's tax base might be diminished (which itself could be caused, exacerbated, or offset by any number of factors).  *See also Havens Realty*, 455 U.S. at 377-78 (plaintiffs alleging that the defendants' racial steering deprived them of the benefits of living in integrated communities had standing if their neighborhoods were in sufficient proximity to the conduct).

And every single "economic condition" Defendants can dream up in this case could or did, to one degree or another, exist and impact the

19

plaintiff's property value in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), but that did not prevent the Supreme Court from upholding the plaintiffs' standing to sue. Plaintiff's property value in that case could have been reduced due to a cracked foundation, ugly carpet, or an out-dated kitchen, but she alleged that "she believed the defendant's conduct accounted for some of the discrepancy," 528 U.S. at 182-83, and, to the Supreme Court, nothing more was required. To establish standing, she did not have to allege or prove that all of the discrepancy was accounted for by the defendant's conduct or that no other factor played a role in the discrepancy.

*Friends of the Earth*, *Gladstone*, and *Havens Realty* all involved injuries which are or could be susceptible to the impact of countless third-party influences. But it is not Plaintiffs' obligation to "negate … speculative and hypothetical possibilities" in order to satisfy Article III. *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 78 (1978) (rejecting challenge to causal link even where defendant claimed not to be "but for" cause of harm). As long as the injury in question is "fairly traceable" to the defendant's conduct, Article III does not rule out a party's standing simply because third parties (may) play some role in the causal

chain. *See Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (court should not "wrongly equate[] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.").

## II.    PLAINTIFFS HAVE STANDING TO SEEK RESCISSION

Defendants' argument that Plaintiffs lack standing to seek rescission entirely misses the point. Plaintiffs do not claim that rescission is an *injury*. Rather, it is a separate remedy and a separate cause of action which requires an entirely separate standing analysis. In that analysis, it simply makes no sense to say that Plaintiffs' injury is "unrealized." The injury for which rescission provides a remedy is the same as the injury for which damages provide a remedy: Plaintiffs paid too much for their homes and were sold property that was other than as represented. The difference is that it is even clearer this injury could not possibility turn in any way on the resale value of the homes – the injury is complete at the time of the purchase and must be redressed *before* a resale has occurred.

The rescission remedy sharpens the focus for the standing inquiry in another way. It is quite clear that Plaintiffs' injury is traceable to Defendants' conduct: it was Defendants to whom Plaintiffs paid the

purchase price for their homes and it is from Defendants, and Defendants alone, that Plaintiffs can seek rescission. That the injury arises directly from the sale is plain.

Nor is Ryland correct that Plaintiffs did not argue that they had standing to sue for rescission in the district court and so should be precluded from making that argument here. *See* Ry.B. at 35-36. On the contrary, on page 6 of their Memorandum of Law in opposition to the motion to dismiss in the *Lennar* case (incorporated by reference in each of the other cases), Plaintiffs argued: "Because plaintiffs are suing for failure to disclose in the context of a real estate transaction they may also seek rescission . . . it is clear that this claim exists for people in Plaintiffs' position, who still own the property; it is silly to argue that Plaintiffs lack standing to assert it."

## III. NO "ALTERNATIVE GROUNDS" WARRANT DISMISSAL OF PLAINTIFFS' CLAIMS

### A. This Court Need Not and Should Not Consider the "Alternative Grounds" Urged by Defendants

Defendants urge dismissal on alternative grounds under both Rule 12(b)(6) and Rule 9(b). Defendants presented arguments under both these rules in the district court, but the district court declined to reach any of the

issues under those rules. *See* Opinion at 30 n.3, ER 30. Although this Court may indeed affirm on grounds other than those cited by the district court, it need not, and should not, reach Defendants' alternative grounds in this case.

As this Court noted in *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1154 (9th Cir. 2000), "the rule that a case may be affirmed on any ground supported by the record is one driven by efficiency considerations." But "[w]hen the efficiency interest no longer obtains because the case will have to be remanded in any event, there is no reason to forego the usual preference for prior trial court consideration of all issues in a case." *Id*.

Here, the district court stated that, if it dismissed the case under either Rule 12(b)(6) or Rule 9(b), it would grant leave to re-plead. As discussed below, *see* Point IV, *infra*, this Court should do the same. In that circumstance, no efficiency consideration supports affirmance on alternate grounds, since a dismissal with leave to re-plead would not come before this Court and this Court need never consider whether the existing complaints comport with Rule 12(b)(6) and/or Rule 9(b). Because reaching

the alternative grounds will not promote efficiency, the ordinary preference for prior trial court consideration is fully applicable.

### B.    Plaintiffs' Claims Should Not Be Dismissed Under Rule 12(b)(6)

Plaintiffs' claims should not be dismissed under Rule 12(b)(6).  As this Court has explained, "To survive a motion to dismiss for failure to state a claim, the plaintiff must allege enough facts to state a claim to relief that is plausible on its face."  *Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (quotation omitted) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  A complaint should only be dismissed if "a plaintiff fails to nudge his or her claims across the line from conceivable to plausible."  *Flores v. Emerich & Fike*, 2008 WL 2489900 (E.D. Cal. June 18, 2008).

In considering a motion to dismiss, "courts must consider the complaint in its entirety," and read it in the light most favorable to plaintiffs, accepting as true all factual allegations in the complaint, as well as reasonable inferences drawn therefrom.  *Tellabs, Inc. v. Makor Issues and Rights Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1098 n.1 (9th Cir. 2009).  The Court should deal only with the complaint's allegations and not substitute the

defendant's conjured speculation about allegations of causation. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002).

> ### 1. The Complaints State Claims for Fraud and Negligent Misrepresentation

Plaintiffs' claims for fraud and negligent misrepresentation are based on (a) Defendants' failure to disclose that they were filling the neighborhoods they were building with high foreclosure-risk buyers; and (b) Defendants' affirmative misrepresentations about the character of the neighborhoods they were building. With respect to the claims based on omissions, Defendants argue that they had no duty to disclose the information that Plaintiffs allege was concealed;[8] with respect to the claims for affirmative misrepresentation, Defendants argue that the misrepresentations alleged were statements of opinion and/or puffery, neither of which are actionable. Neither argument is correct and neither supports dismissal of Plaintiffs' claims.

---

[8] The elements of fraud based on concealment or nondisclosure are: (1) a misrepresentation (false representation, concealment or nondisclosure) that is material; (2) knowledge of falsity ("scienter"); (3) intent to defraud (induce reliance); (4) justifiable reliance; and (5) resulting damage. *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638, 909 P.2d 981 (1996). For fraud based on concealment or nondisclosure, the plaintiff must also allege a duty to disclose.

(a)    Plaintiffs State Claims for Fraudulent and Negligent Omissions

(1)    *California Law Creates a Duty to Disclose Material Facts Affecting the Value or Desirability of Real Property*

Defendants claim that they had no duty to disclose that they were filling the neighborhoods they were building with high foreclosure risk buyers. The law shows otherwise.

California imposes a common law duty on a seller of real property to disclose to the buyer material facts affecting the value or desirability of the property. *Lingsch v. Savage*, 213 Cal. App. 2d 729, 735, 29 Cal. Rptr. 201, 204 (1963); *See also Limandri v. Judkins*, 52 Cal. App. 4th 326, 337, 60 Cal. Rptr. 2d 539 (1997); *Sweat v. Hollister*, 37 Cal. App. 4th 603, 608, 43 Cal. Rptr. 2d 399 (1995). The duty covers all "facts materially affecting the value or desirability of the property."

Here, Plaintiffs allege that Defendants knew about the presence of unqualified and high-foreclosure-risk homeowners in the neighborhood. FAC ¶[9] 66-67, ER 278. The FAC provides further specific facts supporting

---

[9] As was the case in Appellants' Principal Brief, unless expressly indicated otherwise, all citations to the "FAC" are citations to the First Amended Complaint in *Maya v. Centex Corp.*, docket number 10-55658, and citations

(footnote continued on next page)

this allegation, *see* FAC ¶¶ 15, 22, 46, 65; ER 261, 265, 272, 278.    Plaintiffs also allege that this information materially affected the value and desirability of their homes.    Plaintiffs note, moreover, that, whether the matter which was not disclosed was of sufficient materiality to have affected the value or desirability of the property is generally a question of fact.    *Alexander v. McKnight*, 7 Cal. App. 4th 973, 977, 9 Cal. Rptr. 2d 453 (1992).

Defendants, however, claim that the duty to disclose extends only to "physical conditions and legal impediments," *see* JB at 53, with what they characterize as an "outer boundary" extending the rule to cover disclosure of the fact that a family had been murdered on the premises in the past. *See* JB at 53-54, *citing Reed v. King*, 145 Cal. App. 3d 261, 265, 193 Cal. Rptr. 130 (1983).    But the cases show that the duty is not so narrow.    The test is whether the information affects the value or desirability of the property and California courts (and this Court) have applied that test flexibly to include disclosures about neighboring property that affect the value of the real estate being sold and conditions that are neither physical nor legal. *See*

---

to the opinion below ("Opinion") are to the opinion as entered in the *Maya* case.

*Bartleson v. U.S.*, 96 F.3d 1270 (9th Cir. 1996) (shelling from neighboring army base); *Mondragon v. Meritage Homes of California, Inc.*, 2010 WL 1972284 (Cal. App. 3rd Dist. May 18, 2010) (noise and dust from neighboring sawmill); *Shapiro v. Sutherland*, 64 Cal.App.4th 1534 (1998) (neighbors creating disturbing noises and commotion); *Alexander*, 7 Cal.App.4th 973, 9 Cal.Rptr.2d 453 (obnoxious, noisy neighbors).

Indeed, the California Legislature has specifically recognized that the common law duty of disclosure extends to conditions beyond "physical conditions and legal impediments" of the property in question.  In 1994, the Legislature codified the common law duty of disclosure in Cal. Civ. Code § 2079.  Expressing the Legislature's intention that the statute did not alter the existing common law duties, the legislative history states:

> This act is . . . not intended to change any existing duty of a broker or salesperson to disclose material facts within the knowledge of the licensee, including the existence of *nuisances or other conditions of nearby properties that may affect the value or desirability of the property* offered for sale.

*See* Cal. Stats.1994, c. 339 § 3 (S.B.1509) (emphasis added).[10]  Thus, there can be little doubt that conditions of neighboring properties known to the

---

[10] The significance of this legislative history is independent of whether § 2079 actually applies to Plaintiffs' claims. The point is that the Legislature

(footnote continued on next page)

seller, and not evident to the buyer, are within the scope of the duty of disclosure if they affect the value or desirability of the property being sold.

Moreover, California courts have not limited the applicability of the duty to disclose, but rather have been fully willing to adapt the duty to disclose to various circumstances as they arise. In *Reed*, the court was confronted with a "novel" circumstance not raised in previous cases – whether a seller had a duty to disclose that a mother and her four children had been murdered on the property ten years prior to the subject sale. The court noted that while it was well established that nondisclosure of physical defects and legal impediments to the use of real property certainly are material, "no prior real estate sale case has faced an issue of nondisclosure of the kind presented here." After thorough analysis, the court addressed, and rejected, concerns about applying the duty to disclose even in circumstances which do not implicate the physical usefulness of the home:

> The paramount argument against an affirmative conclusion is it permits the camel's nose of unrestrained irrationality admission to the tent. . . . Any fact that might disquiet the enjoyment of

was describing its understanding of the existing common law duty, precisely the one that is at issue here.

29

some segment of the buying public may be seized upon by a disgruntled purchaser to void a bargain.  In our view, keeping this genie in the bottle is not as difficult a task as these arguments assume.  We do not view a decision allowing Reed to survive a demurrer in these unusual circumstances as indorsing the materiality of facts predicating peripheral, insubstantial, or fancied harms.

….

Reed alleges the fact of the murders has a quantifiable effect on the market value of the premises.  We cannot say this allegation is inherently wrong and, in the pleading posture of the case, we assume it to be true.  If information known or accessible only to the seller has a significant and measureable effect on market value and, as is alleged here, the seller is aware of this effect, we see no principled basis for making the duty to disclose turn upon the character of the information.  *Physical usefulness is not and never has been the sole criterion of valuation.*

145 Cal. App. 3d at 267-68, 193 Cal. Rptr. 130 (emphasis added).

Thus, the *Reed* court anticipated, and rejected, Defendants' argument that applying the duty to disclose in "new" circumstances would unreasonably open the floodgates to creation of multiple amorphous duties.  The *Reed* court rejected this argument, holding, instead, that the use of appropriately objective criteria – that the information be known or accessible only to the seller, that it have a significant and measurable effect on the market value of the property, and that the seller be aware of this effect -- ensures that "peripheral, insubstantial, or fancied harms" do not give rise to causes of action.

30

The *Reed* analysis is fully applicable here. Just as in *Reed*, although the concealed information does not involve the physical utility of Plaintiffs' and the putative class members' homes, Plaintiffs nonetheless allege that it has a significant and measurable effect on the market value of their homes. *See* FAC ¶ 50, ER 272. Moreover, as in *Reed*, the concealed information was known only to the sellers and would not have been easily discoverable by Plaintiffs and the putative Class members. *See* FAC ¶ 37-38, 48, ER 270, 272.

> (2) *Defendants Had a Duty to Disclose the Presence of High Foreclosure Risk Buyers In Order to Make Their Voluntary Representations Not Misleading*

Moreover, even if Defendants were not otherwise required to disclose the presence of the high foreclosure-risk buyers, such disclosure was necessary to make the statements that Defendants volunteered not misleading. *See Hoey v. Sony Electronics Inc.*, 515 F.Supp.2d 1099 (N.D. Cal. 2007); *Randi W. v. Muroc Joint Unified School Dist.*, 14 Cal.4th 1066, 929 P.2d 582 (1997); *Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115, 61 Cal.Rptr.3d 221(6th Dist. 2007). As alleged in the Complaints, Defendants represented "that the homes were not being sold to investors [and] that the homes were being built as part of stable and

desirable neighborhoods." FAC ¶ 30, ER 267. Indeed, Defendants represented that it was their "policy not to sell homes to investors," that they "discourage[d] speculation" and that "to provide a stabilized community, [they] intended to sell homes only to people who [would] occupy them." FAC ¶ 41, ER 271. Even if these statements were not outright falsehoods – *but see infra* at Point III-B-1-(b) – these statements gave rise to a duty to disclose Defendants' actual sales and lending practices because, without that additional information, the statements that were made were materially misleading.

### (3)  *The Disclosure at Issue Is Neither Impractical Nor Impossible Nor Illegal*

Defendants claim that it would be absurd to require them to disclose "the existence of buyers whom defendants were allowed, indeed in some cases even encouraged or required to finance," *see* JB at 55; *see also* RAB at 7 (claiming that Plaintiffs' claims promote "red-lining"), but this is a *non sequitur*. The *legality*, or even social utility, of conduct has nothing whatsoever to do with the duty to *disclose*, which turns only on whether the concealed information affects the value or desirability of the property being sold. Thus, the shelling at issue in *Bartleson* was completely legal, and to the extent that it involved training of U.S. military forces, it was no

doubt encouraged or even required – but it nonetheless had to be disclosed to purchasers of the adjoining property because it affected the desirability of that property.  Similarly, the sawmill operations at issue in *Mondragon* were entirely lawful; indeed, the mill owned an easement that expressly permitted the activities.  But there is little doubt that the seller of the houses in the adjoining neighborhood was required to disclose these completely legal activities – and indeed, it did so.  Plaintiffs do not suggest that Defendants were barred from selling – and lending money – to unqualified buyers (although that may also have been true), only that they had to disclose to Plaintiffs what they were doing because it materially affected the value of the surrounding properties.

Defendants also claim that there is no meaningful distinction between a borrower who puts down 20% and one who puts down 18%, essentially contending that the concept of "high foreclosure risk" buyers is too indeterminate to give rise to a duty to disclose.  This argument has at least three flaws. First, Plaintiffs allege numerous undisclosed practices besides the failure to disclose that some buyers had put down less than 20%.  *See* FAC ¶ 25, ER 266.  As these allegations show, this case is not about the difference between 18% and 20% down payments – it is about a

pattern of conduct designed to sell houses regardless of the qualification of the buyers and the concealment of that pattern in order fraudulently to maintain high prices in neighborhoods that, based on the buyers to whom Defendants were selling, did not warrant those prices.

Second, Defendants' argument that there is no distinction between homebuyers who put down 20% and those who put down only 18% ignores a wealth of evidence that, traditionally, qualified home buyers were required to make a 20% down payment in order to purchase a home. *See In re Smith*, 1999 WL 33582223, *2 (Bkrtcy. C.D. Ill. 1999) ("Banks typically require a home buyer obtaining a conventional loan to make a down payment of 20% of the purchase price"); *Munoz v. PHH Corp.*, 659 F. Supp. 2d 1094 (E.D. Cal. 2009) ("Those who purchase a home with less than a 20% down payment must generally purchase private mortgage insurance to protect the lender against the risk of default"); *see also* government websites such as How to Buy a Home With a Low Down Payment guide by the U.S. General Services Administration ("Traditionally, lenders have required that home buyers be able to make a down payment of at least 20

percent of a home's purchase price to get a home loan or mortgage.")[11]; 100 Questions & Answers About Buying a New Home, webpage by the Department of Housing and Urban Development ("Mortgages with less than a 20% down payment generally require a mortgage insurance policy to secure the loan").[12]

Third, to the extent that Defendants claim that the concept of a high foreclosure risk buyer is indeterminate, that is factual issue beyond the scope of a motion to dismiss. Whether *in fact* industry practices were sufficiently clear, whether *in fact* Defendants' conduct fell outside previous norms, and whether, *in fact,* Defendants were well aware that the buyers to whom they were selling represented much higher risks of foreclosure than had previously been the norm may well affect whether Plaintiffs can, ultimately, prevail on their claims. But Plaintiffs allege that this was so, and this Court, like the district court below, must accept these allegations as true. *See Barnes*, 570 F.3d at 1098 n.1.

---

[11] The guide can be found at
http://www.pueblo.gsa.gov/cic_text/housing/low_down/low_down.htm.

[12] *See* http://www.hud.gov/offices/hsg/sfh/buying/buyhm.cfm.

Nor would the disclosure at issue violate any state or federal privacy laws, as Richmond separately suggests. *See* RAB at 7. Plaintiffs do not claim that Defendants were required to disclose any given individual's particular financial condition or the type and amount of financing extended to any given individual. Rather, Plaintiffs claim that Defendants were obligated to disclose their practice of selling homes to high-foreclosure risk buyers, including subprime buyers, their expectation as to how many of the homes would be sold to such buyers, and the percentage of homes in the development neighborhoods which were sold to such buyers. *Lumalu* FAC ¶ 65-70, ER 538-539. Disclosure of such generalized information would certainly not violate any individual's privacy rights.

> (b)     Plaintiffs Allege Actionable Affirmative Misrepresentations

Defendants also argue that the misrepresentations that Plaintiffs have alleged were mere statements of opinion or puffery and cannot support a fraud claim. The statements that Plaintiffs allege were false were:

- that Defendants were "developing a stable neighborhood with owner-occupied houses," "the homes were being built as part of stable and desirable neighborhoods," the community being developed was a "stable, family based neighborhood," and Defendants' "developments were stable, family neighborhoods occupied by owners of the homes," FAC ¶¶ 27, 30, 38, 43, ER 266, 268, 270-71 )

▪ that Defendants had "procedures in place to prevent 'investors' from buying the houses" and that "the homes were not being sold to investors" and that it was Defendants' policy "not to sell to investors" (*id.* at ¶¶ 27, 30, 41, ER 266, 268, 271);

▪ that in order "to provide a stabilized community, [Defendants] intended to sell homes only to people who will occupy them" (*id.* at ¶¶ 41, ER 271); and

▪ that the homes Defendants were selling were "good investments worth equal to or greater than the sales price" and that Defendants' "communities were good investments [where] the value of the house was at least as high as the sales price." (*Id.* at ¶¶ 30, 42, ER 268, 271);

Plaintiffs allege that each of these representations was false. *See* FAC ¶ 48, ER 272. Assuming that to be so, each provides a basis for Plaintiffs' claims.

Defendants claim that "stable" and "desirable" are mere puffery, but they ignore the full scope of what Defendants represented and fail to elaborate what distinguishes puffery from actionable misrepresentations. "The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, *11 (N.D. Cal. June 5, 2009). While "desirable" may indeed be a subjective term, Defendants' representations that they were "developing a stable neighborhood with owner-occupied houses," that "the community being developed was a 'stable, family based

neighborhood,'" and that their "developments were stable, family neighborhoods occupied by owners of the homes," are neither vague nor highly subjective. These were representations of fact and they are actionable. *See Continental Airlines, Inc. v. McDonnell Douglas Corp.,* 216 Cal.App.3d 388, 264 Cal.Rptr. 779 (2d Dist. 1989) (statements about airplane's intended design were representations of fact, not puffery).

Defendants also claim that the representation that they would not sell to investors is too vague to be actionable because the term "investors" is meaningless. But Defendants did not represent merely that they would not sell to "investors": they represented that the neighborhoods they were developing would be "occupied by owners of the homes" and that they were selling homes in these communities "only to people who will occupy them." These were not vague, abstract or undefined representations – they were specific assertions that Defendants were taking steps to ensure that the individuals buying the homes in these neighborhoods planned to live in them. If Defendants, in fact, were taking no such steps, their misrepresentations were false and actionable.

Finally, Defendants claim that representations that the homes were "good investments" and that they were worth the prices Plaintiffs paid are

non-actionable statements of opinion and value.  Statements of opinion and value however, are only non-actionable when they are honestly believed and made in good faith.  "[A]n expression of an opinion, to avoid an action for deceit, must be the expression of an opinion honestly entertained by the person making it." *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 430, 159 P.2d 958, 968 (1945); *see also Pacesetter Homes, Inc. v. Brodkin*, 5 Cal.App.3d 206, 211, 85 Cal.Rptr. 39, 42 (2d Dist. 1970) ("Exceptional circumstances resulting in expressions of opinion being treated as misrepresentations have been found where the one expressing the opinion does not in fact entertain it."); *Vah Dah Dunshee v. Boadway*, 119 Cal.App. 678, 684, 7 P.2d 325, 327 (3d Dist. 1932) ("A false statement regarding the value of property, which is not made in good faith, and which is not warranted by the knowledge or belief of the owner, may furnish the basis of an action for rescission on the ground of fraud or deceit."); *In re Evans*, 181 B.R. 508, 512 (Bkrtcy. S.D. Cal. 1995) (same).

Here, Plaintiffs allege that Defendants *knew* that the homes and neighborhoods were not as represented.  *See* FAC ¶¶ 28, 30, 31, ER 267, 268.  If in fact the opinions were not honestly held, they are actionable.

Nor are Defendants correct that statements concerning the value of property are always non-actionable opinions.  In addition to the exception for opinions of value not genuinely believed, California courts recognize actions for deceit based on statements concerning the value of property "where the opinion amplifies false representations of fact . . . ; where the opinion is expressed in a manner implying a factual basis which does not exist . . . ; where the opinion is expressed as a fact . . . ; and where the expression of opinion is made by a party 'possessing superior knowledge.'"  *Pacesetter Homes*, 5 Cal.App.3d 206, 211, 85 Cal.Rptr. 39, 42 (citations omitted).  *See also Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 834 P.2d 745 (1992) ("when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact."); *McKeever v. Locke-Paddon Co.*, 58 Cal. App. 51, 54-55, 207 P. 1040 (1922) ("That a representation as to the value of property is often a representation of fact, and actionable if false, is well established, especially where the vendee to whom the representation is made is so situated as to have no means of

40

investigating the question for himself, and therefore relies on the statements of value made by the vendor or his agent.").

All of these issues – including whether Defendants genuinely believed the statements they made – raise questions of fact that cannot be resolved on a motion to dismiss.    In this regard, it is significant that California courts have held that whether a statement is a non-actionable opinion or an actionable misrepresentation of fact is, itself, a question of fact.  *Furla v. Jon Douglas Co.*, 65 Cal. App. 4th 1069, 1081, 76 Cal. Rptr. 2d 911 (1998); *Pacesetter Homes,* 5 Cal. App. 3d 206, 85 Cal. Rptr. 39; *Davis v. Monte*, 81 Cal. App. 164, 170, 253 P. 352 (1927).[13]

---

[13] The cases cited by Defendants are not to the contrary.  In *Assilzadeh v. California Federal Bank*, 82 Cal.App.4th 399, 98 Cal.Rptr.2d 176 (2d Dist. 2000), plaintiff alleged that Defendant ought to have disclosed, but did not, a "Brokers Price Opinion" forecasting a decline in value of units in the building based on facts fully disclosed to the buyer; the court held that defendants were not required to disclose the opinion.  The court had no occasion to address the actionability of an opinion actually conveyed.  In *Padgett v. Phariss*, 54 Cal.App.4th 1270, 63 Cal.Rptr.2d 373 (4th Dist. 1997), the trial court, in granting summary judgment, found no evidence that defendant brokers knew of construction problems in the development in which plaintiff bought; the issue on appeal was the extent of the brokers' duty, if any, to inquire about such defects.  As already noted, *Pacesetter Homes* expressly recognizes the circumstances described in the text under which opinions about the value of property may be actionable. And *Title Guarantee & Trust Co. v. Stahler*, 15 Cal.App.2d 239, 59 P.2d 515 (3d Dist. 1936), involved predictions about future development in the area that

(footnote continued on next page)

### 2. *The Complaints State Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing*

Defendants claim that Plaintiffs may not recover for breach of the implied covenant of good faith and fair dealing, but their arguments do not hold up.

First, Defendants claim that it would be against public policy to preclude them from selling homes to high foreclosure risk buyers. As with Defendants' argument that Plaintiffs' fraud claims contravene public policy, this argument, too, misses the point. Plaintiffs do not claim that that all homebuilders and all lenders are precluded from selling property to high foreclosure risk buyers, only that *these* Defendants contracted away their right to do so by the representations that they made. Having agreed to sell property in stable neighborhoods inhabited by traditional buyers, Defendants could not undermine the contracts they made by selling other homes in the neighborhood to buyers whose presence would, they knew, deprive Plaintiffs of the benefits they had promised them.

---

might be expected to enhance the value of the property plaintiff bought. Significantly, *not one of these cases was resolved on a motion to dismiss or a demurrer.* Rather, each involved a decision after trial or on a motion for summary judgment. These cases merely confirm the intensely factual nature of the issue and its unsuitability for resolution at this stage of the case.

Defendants also claim that Plaintiffs may not imply a contractual term that contravenes an express term of the contract. *See* JB at 47. But the covenant of good faith and fair dealing on which Plaintiffs rely does not contravene the "express terms" to which Defendants refer. Defendants claim that the contracts gave them "sole discretion" to change their pricing, product, and marketing methods. But contractual terms permitting a party to act within its "sole discretion" must still be exercised in good faith (*i.e.*, not solely for seller's short term gain at enormous cost to purchasers in the value of the homes contracted for). *See Perdue v. Crocker*, 38 Cal. 3d 913, 923, 216 Cal.Rptr. 345, 352 (1985); *California Lettuce Growers v. Union Sugar, Co.*, 45 Cal.2d 474, 484, 289 P.2d 785, 792 (1955); *see also Gutierrez v. Wells Fargo*, 622 F.Supp.2d 946, 952-53 (N.D. Cal., 2009).

Defendants also point to their contractual statement that they were not representing that the value of the homes would remain equal or increase, but this is simply a general, descriptive (or predictive) statement that is in no way contradicted by good faith limitations on Defendants' sales, marketing, and lending practices. Nor is any agreement that Plaintiffs could not sue for fluctuations in the value of the homes contradicted by the implication of a requirement of good faith – Plaintiffs

43

are not suing for fluctuations in home prices, but rather for Defendants' breach of contract.  To hold otherwise would be to say that a home buyer could not sue for breach of contract for *any* breach that affected the value of the home.

Finally, Defendants point to general merger or integration clauses, *see* JB at 48-49, not contractual terms that expressly permitted Defendants to sell to anyone, despite oral or written pre-contractual representations to the contrary. If such generic merger or integration clauses could preclude implied duties of any kind, the implied covenant of good faith and fair dealing would be eviscerated.  On the contrary, "California law implies the covenant of good faith and fair dealing in *every* contract. . . . " *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 779 (9th Cir. 2003) (emphasis added); *accord Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720, 68 Cal.Rptr.3d 746, 751 (2007).

### 3.    *Plaintiffs Have Properly Pleaded Their Statutory Claims*

Defendants' arguments concerning Plaintiffs' statutory claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and Cal. Bus. & Prof. Code § 17500, *et seq*. (false advertising) are largely derivative of their other arguments.  Thus, Defendants contend that

Plaintiffs cannot prevail under the "unlawful" or "fraudulent" prongs of the UCL, *see* § 17200, because their fraud claims should be dismissed.  This is wrong for two reasons. First, as demonstrated above, Plaintiffs adequately state claims for fraud; if those claims are not dismissed, the UCL claim based on fraudulent or unlawful conduct should not be dismissed either.  *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548, 561 (1999) ("coverage [of 'unlawful' prong of UCL] is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law.").

Second, the UCL's "fraudulent" prong is *less* stringent than common law fraud, *see Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1167, 93 Cal. Rptr. 2d 439, 456-57 (2000) (UCL's fraudulent prong is similar to common law fraud, but with fewer elements), so even if Plaintiffs' common law fraud claim could be dismissed, that would not, in and of itself, warrant dismissal of the fraud claims.

With respect to the "unfair" prong of the UCL, Defendants construe that portion of the statute too narrowly.  Defendants claim that only conduct that "threatens an incipient violation of an antitrust law, or

45

violates the policy or spirit of one of those laws" can violate the "unfair"
prong of the UCL.  *See* JB at 61.   *But the California Supreme Court
expressly disclaimed precisely this proposition in the* Cel-Tech *case.*   In
*Cel-Tech*, 20 Cal. 4th 163, 83 Cal. Rptr. 2d 548, the plaintiff corporation sued
its competitor, arguing that it had engaged in unfair competition.   After
stating precisely the proposition that Defendants offer here, the California
Supreme Court added:

> This case involves an action by a competitor alleging
> anticompetitive practices. *Our discussion and this test are
> limited to that context. Nothing we say relates to actions by
> consumers* . . . .

20 Cal.4th at 187 n.12, 83 Cal.Rptr2d at 565 (emphasis added).[14]

Finally, Defendants claim that the alleged "unfairness" of their
conduct is not "tethered to a constitutional or statutory provision or a
regulation carrying out statutory policy," *see* JB at 60, but this is not so.  On
the contrary, their practices offend the legislative policy and the good faith

---

[14] The cases cited by Defendants were decided by the California Court of
Appeals, in each case quoting the California Supreme Court in *Cel-Tech*,
but failing to recognize the limitation the *Cel-Tech* court placed on this
language.   But the California Court of Appeals cannot over-rule the
California Supreme Court, which has plainly limited this portion of *Cel-
Tech* to lawsuits between competitors. *See Davis v. Ford Motor Credit Co.*,
179 Cal. App. 4th 581, 594-97, 101 Cal. Rptr. 3d 697 (2009) (discussing
application of *Cel-Tech* to consumer cases).

requirement regarding disclosures in selling homes, as set forth in California Civil Code §§ 1102.1 and 1102.7. Furthermore, the practice of processing mortgages for buyers with falsified and inflated unverified income offends the legislative intent regarding income verification, as set forth in 66 Fed. Reg. 65604-01 (2001). (FAC ¶ 67, ER 278.)

Defendants also argue that Plaintiffs' false advertising claims should be dismissed because the complaints do not allege any "untrue or misleading" advertising, but that is not so. Plaintiffs have alleged that Defendants provided to Plaintiffs and the class members false and misleading standardized representations and advertisements regarding the value of the houses, the sales practice of selling to investors, and the desirability of the neighborhood where the houses were sold. FAC ¶ 75, ER 280. The FAC also alleges that these representations and advertisements were material to Plaintiffs and that Plaintiffs and putative Class members justifiably relied on them and were damaged as a result. FAC ¶¶ 76-77, ER 280. Defendants argue, in effect, that Plaintiffs have not pleaded their false advertising claim with sufficient particularity, but where fraud is not the basis of a claim for false advertising, a complaint need not meet the requirements of Rule 9(b), but rather need only provide

the defendant with a short, plain statement of the claim, as prescribed by

Rule 8. *See Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1105 (9th Cir. 2003).

### 4. The Claims of the Lumalu Plaintiffs Should Not Be Dimissed

In its separate answering brief, Richmond presents arguments

specific to the claims of the *Lumalu* Plaintiffs.  But the facts on which

Richmond bases its arguments do not warrant dismissal of these claims.

### (a) Plaintiffs' Claims Do Not Depend on Whether They Financed Their Homes Through Defendants' Mortgage Company Subsidiary

Richmond contends that because two of the three Plaintiffs did not

finance the purchase of their residence through the Richmond-affiliated

mortgage subsidiary, Home American Mortgage Corporation, Plaintiffs'

claims fail.   RAB at 7-9.   This argument is based on a thorough

misconception of Plaintiffs' claims. Moreover, to the extent that it is

addressed to the *uniformity* of Defendants' conduct, it is not only incorrect

as a matter of fact, but relates, if to anything at all, to the propriety of class

certification, rather than to the sufficiency of Plaintiffs' claims

Richmond's argument proceeds against a straw man, what it

describes as "Plaintiffs' theory that the Richmond Appellees forced

'unqualified' buyers to utilize American Home Mortgage Corporation,"

RAB at 8. But Plaintiffs nowhere allege that Richmond (or any of the Defendants) "forced" anyone to use their affiliated mortgage company. What Plaintiffs allege is that Defendants (including Richmond) *encouraged* buyers to do so, and that, as a result of making a significant percentage of the loans for the properties in the developments, Defendants were well aware that substantial numbers of the homes had been sold to purchasers who were not traditionally qualified and who represented a high risk of foreclosure. It was not necessary that Richmond have financed *all* of the buyers with whom it dealt for Richmond to have acquired this knowledge, and even less so in the case of traditionally-qualified buyers, for whom there were a greater number of alternatives than may have existed for the high foreclosure risk buyers whom Richmond did finance. Indeed, to the extent that Richmond was the lender of last resort for unqualified buyers, it would have known about the presence of the high foreclosure risk homeowners in the neighborhood even if it never financed a single traditionally qualified buyer.

Furthermore, the fact that some Plaintiffs did not use Richmond's mortgage subsidiary to finance their homes has no bearing on whether Plaintiffs received the same relevant marketing materials. This is because

49

the relevant misrepresentations and concealment made to Plaintiffs did not occur at the point of financing, but at the point of purchase. Although Richmond's mortgage subsidiary provided information to its affiliated co-defendants regarding the overwhelming presence of high-foreclosure-risk buyers, the relevant misrepresentation and concealment was made by the defendant company that sold the houses to Plaintiffs. This process for purchasing the homes, including the disclosures and representations provided as part of it along with the concealment of material information, were uniform for all purchasers including all three Plaintiffs.

> (b)    Richmond's Vague and General Disclaimers Do Not Shield It From Liability

Richmond claims that "[w]here a plaintiff receives and acknowledges documentation disclosing the harm alleged in the complaint, the plaintiff cannot state a claim under the UCL." RAB 10. This principle has no applicability here because the disclosures Richmond points to are general, vague disclaimers that fail to disclose the material terms Plaintiff allege were omitted, and which perpetuate the misleading nondisclosure and concealment of those material terms. *See Williams v. Gerber Products Co.*, 552 F.3d 934, 938-40 (9th Cir. 2008) (disclosure of ingredients of product did not provide basis to dismiss claim for false advertising based on statements

and pictures on packaging falsely suggesting that product contained certain fruit or fruit juices that it did not and falsely suggesting that it contained no artificial ingredients); *Shin v. BMW of North America*, 2009 WL 2163509, at *1-2 (C.D. Cal. July 16, 2009) (sales brochure did not preclude UCL claim where it stated generally that the wheels are "susceptible to road hazard and consequential damages," but did not plainly and clearly disclose the specific, material facts about the alloy wheels' tendency to crack prematurely; plaintiff was entitled to prove that a reasonable consumer would have been deceived).

In *Williams*, this Court overturned the district court's dismissal on the pleadings of claims under the UCL, noting that claims under that statute "are governed by the 'reasonable consumer' test'" and that "whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer." 552 F.3d at 938. The Court acknowledged that such dismissals have "occasionally been upheld," 552 F.3d at 939, citing *Freeman v. Time Inc.*, 68 F.3d 285 (9th Cir. 1995), but explained that in *Freeman*, the defendant's mailer "explicitly stated multiple times" precisely the information plaintiff claimed had been omitted. The *Williams* court went on to describe as "rare" the situation in

51

which dismissal was appropriate based on disclosures that a defendant claimed were adequate. 552 F.3d at 939. This is not one of those rare cases.

Richmond claims that the disclosures it made preclude Plaintiffs' claims, but the disclosures did not include the material facts that Plaintiffs allege were omitted, including the presence or expected presence of a substantial number of unqualified and high-foreclosure-risk homeowners in the neighborhoods and the absence of the promised policy against selling to investors. While the contract statements make general and vague disclaimers as to the value of the homes, the effect of unidentified economic forces, and Richmond's right to sell other homes under different terms, they make no mention of the specific, material information alleged by Plaintiffs. Nor do they negate those facts to such a degree that no reasonable consumer could have been misled by Defendants' misrepresentations and omissions.

For example, Richmond's statement that it could not *guarantee* that every home would be occupied by its purchaser, *see* RAB at 12, in no way alerted Plaintiffs that Richmond did not have procedures in place to prevent investors from purchasing homes in their developments and that it was not making efforts to ensure that the homes it was selling would be

occupied by their purchasers, when Richmond had specifically represented those things to be true.  Similarly, Richmond's disclaimer that it had the right to "sell, lease, or otherwise dispose of neighboring properties in any manner it chose," *see* RAB at 11, did not negate Richmond's representations that it was creating stable, traditional neighborhoods and did not disclose Richmond's policies of encouraging high foreclosure risk buyers to purchase homes in these neighborhoods.  Whether a "reasonable consumer" would have been deceived by Richmond's misrepresentations and omissions in light of the disclaimers Richmond points to is a question of fact that cannot be resolved at the pleading stage.

### C.    Plaintiffs Have Pleaded Their Fraud Claims with Sufficient Particularity

Plaintiffs have pled their fraud claims with all the particularity that is required under the circumstances.  Federal Rule of Civil Procedure 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007).  Rule 9(b)'s requirements may be relaxed to permit discovery in corporate fraud cases where the evidence of fraud is within a defendant's exclusive control. *United States ex rel. Lee v. Smith Kline Beecham, Inc.*, 245 F.3d 1048, 1052

(9th Cir. 2001); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).  While allegations of fraud based on information and belief do not usually satisfy the requirements of Rule 9(b), "in cases of corporate fraud, plaintiffs will not have personal knowledge of all of the underlying facts." *Moore*, 885 F.2d at 540.  "In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts on which the belief is founded." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (superseded by statute on other grounds).

Moreover, courts have recognized that a plaintiff in a fraudulent concealment suit will "not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Falk v. General Motors Corporation*, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007).  Because such a plaintiff alleges a failure to act rather than an affirmative act, the plaintiff cannot be required to point out the specific moment when the defendant failed to act.  *Id*.  So, a fraud by omission or concealment claim "can succeed without the same level of specificity required by a normal fraud claim."  *Id*.

Here, Defendants cannot legitimately claim that they do not know what is being alleged and cannot respond to the allegations. This is particularly true because, although Plaintiffs do allege affirmative misrepresentations, the primary focus of their claims is on what Defendants *failed* to disclose. Plaintiffs cannot provide the kind of details Defendants say are required in connection with events that did not occur.

Plaintiffs have, however, specified what Defendants failed to disclose and, where affirmative misrepresentations are at issue, what they misrepresented. The specific misrepresentations have already been listed, *see supra* Point III-B-1-(b). Thus, Plaintiffs allege that "While Defendants provided Plaintiffs and all class members certain disclosures before or at the time of sale, they did not provide Plaintiffs and all class members with any disclosure that Defendants had sold houses, and would sell houses in the future, to unqualified and high-foreclosure-risk buyers." *See, e.g.,* FAC ¶ 47, ER 272. Plaintiffs further allege the month and year of purchase for each plaintiff's home, thus providing specificity as to the time of the disclosures and representations that were made and those that weren't. *See* FAC ¶¶ 37-38, ER 270; (*Martinez* FAC ¶ 34, ER 307; *Lumalu* FAC ¶¶ 38-40, ER 347-48; *Stephens* FAC ¶¶ 36-37, ER 386-87; *Kelly* FAC ¶¶ 39-40,

ER 425-26; *Nielsen* FAC ¶ 35, ER 492-93; *Oneto* FAC ¶¶ 37-39, ER 529-30; *Dodaro* FAC ¶ 35, ER 568).  These details sufficiently apprise Defendants of Plaintiffs' claims.

## IV.  IF ANY PART OF PLAINTIFFS' CLAIMS IS DISMISSED, PLAINTIFFS SHOULD BE GRANTED LEAVE TO RE-PLEAD

Ryland claims that the district court correctly denied leave to re-plead with respect to standing because any re-pleading would have been futile, but that is not so.  Plaintiffs alleged that their injury was distinct from a decline in housing prices caused by general economic conditions. This ought to have been sufficient, but if it was not, Plaintiffs offered to provide expert testimony showing how that could be so. In response, Ryland asks this Court to determine that any expert analysis that differentiates declines in housing prices caused by market fluctuations from declines caused by revelation of the true character of the neighborhoods that Defendants built would be based on improper speculation – without either the Defendants or the Court ever seeing the expert analysis.  They suggest that the court's gate-keeping function with respect to expert testimony can now be exercised based entirely on the intuition of the Defendants or the court.  That is not the law.

Defendants also argue in the Joint Brief that, if this Court were to uphold the dismissal of Plaintiffs' claims under Rule 9(b), leave to re-plead should be denied. They make this argument in the face of the district court's pronouncement that it "would have granted leave to amend as to Rule 9(b) and the 12(b)(6) failure to state a claim." Transcript at 7:13-14, ER 247. There is no reason for this Court to over-ride the district court's judgment on this point and good reason for it not to do so.

Plaintiffs have not yet had an opportunity to re-plead in response to an indication from any court about what is lacking in their pleadings. If this Court believes that Plaintiffs have failed to provide sufficient detail, or omitted to include facts bearing on constitutional standing or that would render a deficient claim sufficient, Plaintiffs should be given an opportunity to correct their pleadings, if they can, so that the district court can determine whether Plaintiffs state claims against Defendants based on the merits of the claims, not on the technicalities of pleading. *See* Fed.R.Civ.P. 15(a) (leave to amend to be "freely given when justice so requires").

CONCLUSION

For the foregoing reasons, and for the reasons set forth in Appellants' Principal Brief, this Court should reverse the district court's dismissal of Plaintiffs' claims.

Dated: December 27, 2010

Respectfully submitted,


_/s/_ Andrea Bierstein
Andrea Bierstein
abierstein@hanlyconroy.com
HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP
112 Madison Avenue, 7th Floor
New York, New York 10016
Phone: (212) 784-6403
Fax: (212) 213-5949

Richard D. McCune
rdm@mccunewright.com
David C. Wright
dcw@mccunewright.com
Jae (Eddie) K. Kim
jkk@mccunewright.com
MCCUNEWRIGHT LLP
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Phone: (909) 557-1250
Fax: (909) 557-1275

Derek Y. Brandt
dbrandt@simmonsfirm.com
SIMMONS BROWDER GIANARIS
ANGELIDES & BARNERD LLC
707 Berkshire Boulevard
East Alton, Illinois 62024
Phone: (618) 259-2222
Fax: (618) 259-2251

## CERTIFICATE REGARDING COMPLIANCE

I certify that this brief contains 12,436 words excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii), as counted by the word-counting feature of Microsoft Word 2007.  I further certify that Appellant has concurrently filed a motion seeking leave to file an oversized brief.


 /s/ Andrea Bierstein
Andrea Bierstein

9th Circuit Case Number(s)

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)                    .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)                    .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)